**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| INNKEEPERS USA TRUST, *et al.*, | : Case No. 10-13800 (SCC) |
| Debtors. | : |
| | Jointly Administered |
| INNKEEPERS USA TRUST, *et al.*, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Adversary Proceeding |
| | : Case No. 11-02557 |
| CERBERUS SERIES FOUR HOLDINGS, LLC, | : |
| CHATHAM LODGING TRUST, INK | : |
| ACQUISITION LLC, AND INK ACQUISITION | : |
| II LLC, | : |
| | : |
| | : |
| | : |
| Defendants. | : |

----------------------------------------------------------- x

## DEFENDANTS' PRETRIAL BRIEF

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 5

ARGUMENT ....................................................................................................... 39

I.   DEFENDANTS PROPERLY TERMINATED THE COMMITMENT
     LETTER ....................................................................................................... 39

     A.  By Its Terms, the MAE Clause in the Term Sheet Includes Reasonable
         Expectations Regarding the "Prospects" of the Fixed/Floating Debtors ................... 39

     B.  Macroeconomic Occurrences Can Constitute a Material Adverse Event
         Under the MAE Clause in the Term Sheet ................................................. 45

     C.  The Determination of Whether a Material Adverse Event Occurred
         Must Be Viewed From the Perspective of the Reasonable Acquiror ........................ 47

II.  IF A MATERIAL ADVERSE EVENT DID NOT OCCUR, THE
     DEBTORS' SOLE REMEDY AT LAW OR IN EQUITY IS TO
     RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES ......................... 49

     A.  The Liquidated Damages Clause Applies Because the Bidding
         Procedures Order Is a Judicial Order that Is Binding on the Parties ..................... 49

     B.  The Bidding Procedures Order Is Incorporated by Reference in Section
         6 of the Commitment Letter In Clear and Unambiguous Terms .......................... 52

     C.  The Reference to the Bidding Procedures Order in Section 6 of the
         Commitment Letter Must Be Given Effect ................................................. 55

     D.  The Liquidated Damages Clause under the Bidding Procedures Order
         Bars Specific Performance as a Matter of Law ............................................ 58

     E.  The Liquidated Damages Clause Was Not "Deleted" From the
         Commitment Letter ........................................................................... 60

     F.  Debtors Never Mentioned Any Purported Waiver of Liquidated
         Damages by Cerberus/Chatham Until Filing This Adversary
         Proceeding ..................................................................................... 63

     G.  The Integration Clause in the Commitment Letter Does Not Bar the
         Applicability of the Liquidated Damages Clause in the Bidding
         Procedures ..................................................................................... 65

     H.  If Parol Evidence Is Admissible to Determine the Scope of the
         Integration Clause, Parol Evidence Would Show that the Parties Did
         Not Intend for the Integration Clause to Preclude the Application of the
         Bidding Procedures ........................................................................... 68

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

III.    EVEN IF THERE WERE NO MATERIAL ADVERSE EVENT AND
EVEN IF THE LIQUIDATED DAMAGES CLAUSE DID NOT
APPLY, SPECIFIC PERFORMANCE SHOULD BE DENIED
BECAUSE DEBTORS HAVE AN ADEQUATE REMEDY AT LAW ..................... 70

IV.    CERBERUS/CHATHAM DID NOT VIOLATE THE
CONFIRMATION ORDER OR UNDERLYING PLAN OF
REORGANIZATION..................................................................................................... 72

V.    DEBTORS' EQUITABLE ESTOPPEL CLAIM SHOULD BE
DISMISSED .................................................................................................................. 74

VI.    CONCLUSION ............................................................................................................. 75

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                          <u>**PAGE(S)**</u>

*200 East 87th Street Assocs. v. MTS, Inc.*,
    793 F. Supp. 1237 (S.D.N.Y. 1992).................................................................64

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
    No. 04 Civ. 10014 (PKL), 2006 WL 1493132 (S.D.N.Y. May 31, 2006)................................71

*Babitt v. Vebeliunas (In re Vebeliunas)*,
    332 F.3d 85 (2d Cir. 2003)...................................................................74

*Bethlehem Steel Co. v. Turner Constr. Co.*,
    141 N.E.2d 590 (N.Y. 1957)...................................................................52

*Bourgal v. Lakewood Haulage Inc.*,
    827 F. Supp. 126 (E.D.N.Y. 1993) ...........................................................55

*Breed v. Ins. Co. of N. Am.*,
    385 N.E.2d 1280 (N.Y. 1978).................................................................53

*Broad v. Rockwell Int'l Corp.*,
    642 F.2d 929 (5th Cir. 1981) ...............................................................53

*In re Clark Retail Enters., Inc.*,
    308 B.R. 869 (Bankr. N.D. Ill. 2004) ........................................................58

*Creative Waste Mgmt., Inc. v. Capital Envtl. Servs., Inc.*,
    429 F. Supp. 2d 582 (S.D.N.Y. 2006)................................................53, 54, 67, 68

*In re Delphi Corp.*,
    Nos. 05-44481(RDD), ADV 08-01232-RDD, 08-01233-RDD,
    2008 WL 3486615 (Bankr. S.D.N.Y. Aug. 11, 2008) ........................................ 58-59

*Deutsche Lufthansa AG v. Boeing Co.*,
    No. 06 CV 7667 (LBS), 2006 WL 3155273 (S.D.N.Y. Oct. 30, 2006)....................................59

*Exhibitgroup/Giltspur, Inc. v. Spoon Exhibit Servs.*,
    273 A.D.2d 874 (4th Dep't 2000)............................................................67

*Frontier Oil Corp. v. Holly Corp.*,
    Civ. A No. 20502, 2005 WL 1039027 (Del. Ch. Apr. 29, 2005) ................................41, 46, 48

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,*
    850 N.E.2d 653 (N.Y. 2006) ....................................................................................................63

*Galleria Invs. LLC v. Hong Duck LLC (In re Galleria Invs. LLC),*
    No. A06-62557-PWB, 2008 WL 7842107 (Bankr. N.D. Ga. Apr. 4, 2008) .....................49, 50

*Galli v. Metz,*
    973 F.2d 145 (2d Cir. 1992)....................................................................................................55

*Garza v. Marine Transp. Lines, Inc.,*
    861 F.2d 23 (2d Cir. 1988)......................................................................................................55

*Genesco, Inc. v. Finish Line, Inc.,*
    No. 07-2137-II (III), Mem. and Order (Tenn. Chan. Ct. Dec. 27, 2007)...........................46, 48

*Giles v. Rhodes,*
    No. 94 CIV 6385 (CSH), 2000 WL 1425046 (S.D.N.Y. Sept. 27, 2000) ................................44

*Great Lakes Chem. Corp. v. Pharmacia Corp.,*
    788 A.2d 544 (Del. Ch. 2001)..................................................................................................46

*Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.,*
    No. CIV.A. 3:8CV0102B, 2008 WL 3925272 (N.D. Tex. Aug. 27, 2008),
    *aff'd,* 377 F. App'x 422 (5th Cir. 2010) ........................................................................53, 60, 68

*In re IBP, Inc. S'holders Litig. (IBP, Inc. v. Tyson Foods, Inc.),*
    789 A.2d 14 (Del. Ch. 2001)......................................................................................46, 47, 48

*Laba v. Carey,*
    277 N.E.2d 641 (N.Y. 1971) ..............................................................................................52, 53

*LaBarbera v. Hardin Contracting Inc.,*
    No. 07-CV-5063 (ENV)(SMG), 2010 WL 148084 (E.D.N.Y Jan. 13, 2010).........................55

*Lucente v. Int'l Bus. Machs. Corp.,*
    310 F.3d 243 (2d Cir. 2002)....................................................................................................70

*Mastrobuono v. Shearson Lehman Hutton, Inc.,*
    514 U.S. 52 (1995)..................................................................................................................47

*Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.,*
    269 F. Supp. 2d 206 (S.D.N.Y. 2003)......................................................................................70

*MTX Commc'ns Corp. v. LDDS/Worldcom, Inc.,*
    132 F. Supp. 2d 289 (S.D.N.Y. 2001)......................................................................................44

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

*Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*,
    320 F.3d 1260 (11th Cir. 2003) ...................................................................55

*Navillus Tile, Inc. v. Turner Constr. Co.*,
    2 A.D.3d 209 (1st Dep't 2003) ............................................................... 63-64

*Nip v. Checkpoint Sys., Inc.*,
    154 S.W.3d 767 (Tex. App. 2004)..................................................................41

*Papa Gino's of Am., Inc. v. Plaza at Latham Assocs.*,
    135 A.D.2d 74 (3d Dep't 1988)......................................................................59

*Red Ball Interior Demolition Corp. v. Palmadessa*,
    173 F.3d 481 (2d Cir. 1999)...........................................................................52

*Reiss v. Fin. Performance Corp.*,
    764 N.E.2d 958 (N.Y. 2001)..........................................................................52

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*,
    Nos. 08- CV-7069 (KMK), 08-CV-11108 (KMK),
    2009 WL 1154094 (S.D.N.Y. Mar. 19, 2009) .....................................70, 71

*R/S Assocs. v. N.Y. Job Dev. Auth.*,
    771 N.E.2d 240 (N.Y. 2002)..........................................................................52

*Rubinstein v. Rubinstein*,
    244 N.E.2d 49 (N.Y. 1968)............................................................................59

*Scholastic, Inc. v. Harris*,
    259 F.3d 73 (2d Cir. 2001).............................................................................55

*S. Fed. Sav. & Loan Ass'n of Ga. v. 21-26 E. 105th St. Assocs.*,
    145 B.R. 375 (S.D.N.Y. 1991)......................................................................74

*In re U.S. Brass Corp.*,
    301 F.3d 296 (5th Cir. 2002) .........................................................................74

*U.S. Trust Co. of N.Y. v. Alpert*,
    10 F. Supp. 2d 290 (S.D.N.Y. 1998),
    *aff'd sub nom. U.S. Trust Co. of N.Y. v. Jenner*,
    168 F.3d 630 (2d Cir. 1999)...........................................................................53

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000)...........................................................................53

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
807 N.E.2d 876 (N.Y. 2004)..........................................................................................56

*Vill. of Rosemont v. Jaffe*,
482 F.3d 926 (7th Cir. 2007) .........................................................................................73

*W.W.W. Assocs., Inc. v. Gianconteri*,
566 N.E.2d 639 (N.Y. 1990)..............................................................................52, 53, 60

## STATUTES

11 U.S.C. § 1142(b)......................................................................................................39, 72

## RULES

Fed. R. Civ. P. 30(b)(6) ......................................................................................4, 42, 62, 66, 71

## OTHER AUTHORITIES

11 Williston on Contracts § 32:5 (4th ed.) ....................................................................55

Bank of America Merrill Lynch, *U.S. REIT Weekly, Summer of Decline for Global
Equity Markets,* Sept. 16, 2011, at 1 ...........................................................................28

Barclays Capital, *U.S. Gaming, Lodging & Leisure: Examining the Downside,*
Aug 19, 2011, at 1........................................................................................................33

Blue Chip Economic Indicators, *Top Analysts' Forecasts of the U.S. Economic Outlook
For the Year Ahead*, Vol. 36, No. 8, Aug. 10, 2011, at 1 .........................................29

Blue Chip Economic Indicators, *Top Analysts' Forecasts of the U.S. Economic Outlook
For the Year Ahead*, Vol. 36, No. 9, Sept. 10, 2011, at 1 ...................................30, 31

Goldman Sachs, *Americas: Real Estate: REIT's,* Aug. 11, 2011, at 2 ..........................33

Goldman Sachs, *Americas: Lodging Cycle Not Over; Aligning PT's/Estimates for More
Modest Economy,* Sept. 12, 2011, at 1-3.....................................................................34

Raymond James, *Lodging: Lowering Estimates on Economic Concerns;
Stock Value Attractive,* Aug. 31, 2011, at 1 ........................................................34, 35

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

Janney Capital Markets, *Starwood Capital Buys a Little More from Hersha; Reiterate
BUY,* Aug. 18, 2011, at 1 ........................................................................................................34

Janney Capital Markets, *Growth Mode in Limbo, But Yield Story Still Intact; Reiterate
BUY,* Aug. 23, 2011, at 1 ........................................................................................................35

Forrest Jones, *Goldman Sachs Report Warns of New Financial Crisis,* Money News,
Sept. 5, 2011 ............................................................................................................................28

Tibita Kaneene, *Innkeepers Strikes USB 1bn Deal with Five Mile and Lehman Led
Group to Sell 64 Hotels,* Debtwire, Sept. 30, 2011..................................................................72

Herbert F. Kozlov & Jonathon P. Moyer, *Deal Termination Litigation:
The 'Material Adverse Change Clause' and Other Escape Clauses in a
Tightening Deal Market,* Reed Smith Bulletin 08-002, at 5 (Jan. 2008) .................................47

Robert T. Miller, *Canceling the Deal: Two Models of Material Adverse Change Clauses
in Business Combination Agreements,* 31 Cardozo L. Rev. 99, 122-13 (Sept., 2009) .............42

Morgan Stanley, *Lodging: Lowering Estimates on Macro Uncertainty,
Downgrade HOT,* Aug. 26, 2011, at 2, 8, 23 ...............................................................33, 35, 36

Mike Spector & Eliot Brown, *Innkeepers is in Talks with New Set of Buyers,*
Wall St. J., Sept. 17, 2011 ........................................................................................................72

Wells Fargo Securities, *RLJ: Acquisitions to Accelerate - Adj. Ests., Valuation Range,*
Aug. 11, 2011, at 1...................................................................................................................35

Press Release, *Standard & Poor's, S&P Downgrades U.S. Debt Rating* (Aug. 5, 2011) .............37

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

### PRELIMINARY STATEMENT

This Adversary Proceeding arises from a Commitment Letter and Term Sheet between Plaintiffs Innkeepers USA Trust, a Maryland corporation, and its affiliated debtors and debtors-in-possession (collectively, "Innkeepers" or "Debtors") and a joint venture comprised of Defendants Cerberus Series Four Holdings, LLC, Chatham Lodging Trust, INK Acquisition LLC and INK Acquisition II LLC (collectively, "Defendants" or "Cerberus/Chatham"). At an auction held on May 2, 2011 that was conducted in accordance with Bidding Procedures approved by an Order entered by this Court, Cerberus/Chatham was declared the Successful Bidder for the Fixed/Floating Debtors with a final bid having an implied value of approximately $1.12 billion. On May 16, 2011, in accordance with the Bidding Procedures, Innkeepers and Cerberus/Chatham entered into the Commitment Letter and Term Sheet, memorializing the terms and conditions for Cerberus/Chatham's acquisition of the Fixed/Floating Debtors.

The Commitment Letter confirms that Cerberus/Chatham made a $20 million Deposit "[i]n accordance with the Bidding Procedures Order." The Bidding Procedures Order provides that in the event that the Successful Bidder breaches or otherwise fails to perform, retention of the $20 million Deposit is the Fixed/Floating Debtors' "sole remedy at law and in equity" as liquidated damages. Pursuant to the Term Sheet, Cerberus/Chatham had the right to terminate its obligations under the Commitment Letter and to have its Deposit returned if a material adverse event (as defined in the Term Sheet) occurred.

Since May 16, 2011, a series of unforeseeable, unprecedented and materially adverse economic developments have occurred that can be and are reasonably expected to have a material adverse effect on the assets, business, operations and prospects of the Fixed/Floating Debtors. Those events include: (1) U.S. economic conditions deteriorated significantly; (2)

1

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

reduced U.S. GDP projections; (3) widespread reports of a possible "double dip" recession; (4) a

30-40% decline in the equity market value of comparable lodging operators; (5) Standard &

Poor's ("S&P") downgrade of the United States' credit rating; (6) downgraded expectations

regarding lodging industry prospects; (7) analysts revising downward substantially their revenue

forecasts for the lodging sector; (8) expectations about disruptions in hotel asset sales; and (9)

severe tightening in the capital markets.  Cerberus/Chatham believe that these unprecedented

events could reasonably be expected to have and, in fact, have had a material adverse effect on

the Fixed/Floating Debtors taken as a whole.  In light of these events, on August 19, 2011,

Cerberus/Chatham properly exercised its right to terminate the Commitment Letter and requested

the return of its $20 million Deposit.

This Adversary Proceeding fundamentally requires two questions to be addressed:

(1) whether Cerberus/Chatham properly terminated the Commitment Letter due to the

occurrence of a material adverse event as defined by the Term Sheet; and (2) if not, whether

Debtors' retention of the $20 million as liquidated damages is their sole remedy.  Debtors seek

the extraordinary equitable remedy of specific performance, but they are not entitled to it

because (1) Defendants properly terminated the Commitment Letter, and (2) even if Defendants

did not properly terminate it, this Court's binding Bidding Procedures Order provides that

Debtors' "sole remedy at law and in equity" is retention of Defendants' $20 million Deposit, as

liquidated damages.  Even if the liquidated damages provision of the Bidding Procedures Order

does not apply, and it does, the Debtors' Chief Restructuring Officer and expert themselves have

admitted that Debtors have an adequate remedy at law.

Debtors contend that no material adverse event occurred because the performance

of the Fixed/Floating Debtors "remains strong" to date.  Debtors' contention, however, is

2

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

fundamentally flawed. Under the terms of the material adverse event provision, a Termination

Event occurs if there is a condition, change, or development that <u>could reasonably be expected</u> to

have a material adverse effect on, among other things, the <u>prospects</u> of the Fixed/Floating

Debtors taken as a whole. There is no question that the abrupt, substantial deterioration in the

economy that preceded Cerberus/Chatham's termination could reasonably be expected to have

such an effect. Already the values of publicly-traded companies that are comparable to the

Fixed/Floating Debtors had plummeted in anticipation of substantially diminished future

earnings. Revenue forecasts for the sector have been substantially downgraded, and it is little

wonder. There is no dispute that the lodging industry is highly sensitive to macroeconomic

factors, and a profound economic downturn of the sort that developed in the weeks before

Cerberus/Chatham terminated the Commitment Letter unquestionably will have a significant

negative effect on the Fixed/Floating Debtors' prospects.

Debtors also contend that Cerberus/Chatham "deleted" the liquidated damages

provision from its Commitment Letter. The clear and unambiguous terms of Section 6 of the

Commitment Letter, however, show that the Bidding Procedures Order, which contains a

liquidated damages provision, was incorporated by reference in the Commitment Letter by

providing that the $20 million Deposit was made "in accordance with the Bidding Procedures

Order." In fact, under any other interpretation, there would be no provision in the Commitment

Letter or Term Sheet addressing the following essential terms:

- the type of account in which the Deposit would be held, such as an escrow or other type of account;
- who would own the account;
- whether interest would be earned on the Deposit;
- in whose name the account would be held;
- whether the Deposit would be subject to the liens or claims of any creditors of

3

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

the Debtors;

- whether the Deposit would be considered property of the Debtors' estates;

- what would happen to the Deposit in the event that Cerberus/Chatham's bid was not deemed to be a Qualified Bid;

- whether the Deposit would be credited towards Cerberus/Chatham's equity commitment at closing if Cerberus/Chatham were declared to be the Successful Bidder (or the Backup Bidder, if applicable);

- what would happen to the Deposit in the event Cerberus/Chatham, if declared to be the Successful Bidder (or the Backup Bidder) failed to consummate the restructuring transactions contemplated in the Successful Bid (or the Backup Bid, if applicable) because of a breach or failure to perform; or

- whether retention of the Deposit, as liquidated damages, would serve as the Fixed/Floating Debtors' sole remedy at law or in equity in the event Cerberus/Chatham, if declared the Successful Bidder or Backup Bidder, breached or failed to perform.

The treatment of the Deposit in each of these circumstances is specifically addressed in the Bidding Procedures, but is not repeated in the language of the Commitment Letter. The Commitment Letter, however, fills that gap by clearly and unambiguously incorporating the Bidding Procedures Order by reference.

Debtors further contend that the Commitment Letter precludes application of the Bidding Procedures Order by virtue of the "Entire Agreement" provision (the "Integration Clause") in the Commitment Letter. That position is plainly incorrect because the Integration Clause, by its own terms, only applies to supersede other "agreements and understandings among the parties." Debtors cannot seriously contend that the Bidding Procedures Order – an order entered by this Court upon motion filed by the Debtors prior to Cerberus/Chatham's involvement – is somehow merely an "agreement" or "understanding" between Innkeepers and Cerberus/Chatham. Indeed, Debtors' Chief Restructuring Officer and Rule 30(b)(6) witness admitted that the Bidding Procedures Order is not an "agreement" or an "understanding" between Debtors and Cerberus/Chatham. Nor can a contract's integration clause preclude

4

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

application of a document expressly referenced in the contract itself. Accordingly, Debtors'

litigation-crafted position collapses under the weight of the documents themselves. Not

surprisingly, Debtors never told <u>anyone</u> – not Cerberus/Chatham, not Five Mile, not Lehman, not

Midland, not even Debtors' own Board of Trustees – that Cerberus/Chatham's Commitment

Letter had somehow waived the liquidated damages clause in the Bidding Procedures.

Debtors also contend that they would be entitled to specific performance because,

even if they found a different buyer for the Fixed/Floating Debtors, damages "may be difficult to

ascertain." However, even assuming there was no material adverse event and that the liquidated

damages provision of the Bidding Procedures Order does not apply, Debtors' own expert admits

that Debtors' damages, if any, can be calculated by taking the difference between the price

Cerberus/Chatham agreed to pay and the price a new buyer agrees to pay. Accordingly, because

Debtors have an adequate remedy at law, they are not entitled to specific performance.

## STATEMENT OF FACTS

On July 19, 2010, Innkeepers USA Trust, a Maryland corporation, and its

affiliated debtors and debtors-in-possession (collectively, "Innkeepers" or "Debtors"), filed a

voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code in the U.S.

Bankruptcy Court for the Southern District of New York [Doc. No. 1]. Innkeepers is a self-

administered Maryland real estate investment trust ("REIT") with a primary business focus of

acquiring premium-branded upscale extended-stay, mid-priced limited service and select-service

hotels. (Disclosure Statement, May 19, 2011, at 20 [Doc. No. 1444].) Innkeepers indirectly

owns and operates 71 hotels. (Beilinson Decl. ¶ 4 [Doc. No. 1776].)

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

**Debtors Select Five Mile/Lehman as the Stalking Horse Bidder**

In or around October 2010, Debtors, in consultation with their investment banker,
Moelis & Company ("Moelis"), began marketing for a stalking horse plan sponsor to conduct an
enterprise-wide auction of Innkeepers. (Bidding Procedures Motion at 9 [Doc. No. 820].) On or
shortly after November 23, 2010, Debtors received proposals from four candidates, including a
proposal from Five Mile and Lehman (collectively, "Five Mile/Lehman"). (*Id.* at 20.) Debtors
evaluated these proposals and, in consultation with Moelis, conducted a side-by-side analysis of
the proposals. (Derrough Decl. ¶ 13 [Doc. No. 821].) On December 2, 2010, Moelis gave a
presentation to Innkeepers' Independent Committee of the Board of Trustees (the "Independent
Committee"), summarizing the terms of the proposals, and comparing the contemplated
recoveries under each proposal. (Derrough Decl. ¶ 15 [Doc. No. 821].) On December 7 and 8,
2010, Debtors and their advisors met in person or by telephone with each of the key
constituencies, including Midland, Lehman, and others. (*Id.* ¶ 19.) At these meetings, the
Debtors' management and advisors provided the key constituencies with documentation
summarizing each of the proposals. (*Id.*)

On December 13, 2010, Five Mile/Lehman agreed to improve their proposal,
which contemplated an enterprise-level transaction involving Debtors' entire portfolio. (*Id.*)
Under Five/Mile Lehman's improved proposal, Five Mile would invest new cash equity, Lehman
would exchange 100% of its claims against the Debtors on account of the Floating Rate
Mortgage Loan for up to 50% of the new equity and a distribution of cash, and Midland would
provide stapled financing for the transaction through an amendment and restatement of the Fixed
Rate Mortgage Loan in a reduced amount (the "Midland Financing"). (*Id.* at 3-4.) Midland
agreed to make the Midland Financing portable to qualified bidders at the auction so long as,

6

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

among other things, the contemplated debt-to-capital ratio for the reorganized enterprise in any

such bid was no more than 70% and Lehman received a cash payment of at least $200.3 million

for its claims against Debtors. (*Id.* at 4.)

Thereafter, Debtors and their advisors conducted a further side-by-side analysis of

Five/Mile Lehman's improved stalking horse proposal and the other stalking horse proposals and

concluded that the Five Mile/Lehman's bid provided the highest and best offer to date. (*Id.*

¶¶ 26-27.) On December 23, 2010, Innkeepers' Independent Committee and Board determined

that the Five Mile/Lehman bid was the best stalking horse bid for an auction of Innkeepers (the

"Five Mile/Lehman Stalking Horse Bid"). (*Id.* ¶ 39.)

To facilitate a formal auction process, Debtors, Five Mile/Lehman, and Midland

negotiated comprehensive Bidding Procedures. (Bidding Procedures Motion at 10 [Doc. No.

820].) Under the Bidding Procedures, the auction process would begin with a 45-day period to

find qualified competing bids. (*Id.*) In the event that one or more qualified competing bid

emerged, Debtors would hold an auction between Five Mile/Lehman (as the stalking horse

bidder) and the other qualified bidders. (*Id.* at 10-11.) Under the Bidding Procedures, a bidder is

qualified to participate in the auction only if its bid contemplates an enterprise-level restructuring

based substantially on the debt and capital structure outlined in the Five Mile/Lehman Stalking

Horse Bid. (*Id.* at 11.) In other words, the bids had to be based on the Five Mile/Lehman

Stalking Horse Bid to "ensure the Debtors' ability to compare bids on an 'apples to apples'

basis." (*Id.*)

To find bidders for the auction, Debtors and Moelis solicited indications of

interest for competing bids from more than 100 additional potential investors. (Derrough Decl.

¶ 41 [Doc. No. 821].) As part of their marketing efforts to find potential bidders, Debtors and

7

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

Moelis issued process letters and press releases, attended a lodging conference, conducted

numerous meetings with Debtors' key constituencies and sent "teasers" to those entities that had

expressed an initial indication of interest (all of which stated that any bids would be governed by

the Bidding Procedures).  (Derrough Decl. ¶ 41 [Doc. No. 821]; Memo of Law for Plan of

Reorganization Confirmation ¶ 41 [Doc. No. 1775]; Ex. 1 (Innkeepers USA Trust, "Summary

Process Update, Bidding Procedures & Stalking Horse Bid," dated Jan. 2011, at 2-3

(summarizing the bidding procedures and stating that the summary is "qualified in its entirety by

the Bidding Procedures and other relevant documents (filed in Docket No. 820)"); Ex. 2

(Innkeepers USA, "Confidential Information Memorandum," dated Mar. 2011, at 4 (informing

prospective bidders that the Bidding Procedures "govern the submission of overbids to the

Stalking Horse Bid and additional bids")); Ex. 3 (Innkeepers USA, "Investment Opportunity,"

dated Mar. 2011, at 3 (same)).)[1]

On January 14, 2011, Debtors and Five Mile/Lehman entered into a Commitment

Letter and Term Sheet (the "January Five Mile/Lehman Commitment Letter") memorializing the

Five Mile/Lehman Stalking Horse Bid, and Debtors filed a motion seeking, among other things,

authority to enter into the January Five Mile/Lehman Commitment Letter and approval of the

---

[1]     Citations to "Ex. __" refer to the exhibits attached to the Affirmation of Alan R. Glickman in Support of the
Defendants' Pretrial Brief ("Glickman Affirmation") filed concurrently herewith.

Citations to "Cook Dep." refer to the Deposition of Nathan J. Cook, dated September 27, 2011, attached as
Exhibit 28 to the Glickman Affirmation.  Citations to the "Derrough Dep." refer to the Deposition of William Q.
Derrough, dated September 28, 2011, attached as Exhibit 29 to the Glickman Affirmation.  Citations to the
"Beilinson Dep." refer to the Deposition of Marc Beilinson, dated September 30, 2011, attached as Exhibit 30 to the
Glickman Affirmation.

Citations to the "Fischel Report" refer to the Expert Report of Daniel R. Fischel, submitted on behalf of
Defendants and attached as Exhibit 31 to the Glickman Affirmation.  Citations to the "Manzo Report" refer to the
Expert Report of Robert Manzo, submitted on behalf of Defendants and attached as Exhibit 32 to the Glickman
Affirmation.  Citations to the "Talley Report" refer to the Expert Report of Eric L. Talley, submitted on behalf of
Defendants and attached as Exhibit 33 to the Glickman Affirmation.

Citations to the "Zmijewski Report" refer to the Expert Report of Mark E. Zmijewski, submitted on behalf
of Debtors.  Citations to the "Corgel Report" refer to the Expert Report of John B. Corgel, submitted on behalf of
Debtors.

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

Bidding Procedures (the "Bidding Procedures Motion"). (Bidding Procedures Motion at 3 [Doc.
No. 820].)

    Although the Five Mile/Lehman Stalking Horse Bid encompassed all of Debtors'
hotels, on March 9, 2011, Debtors and Five Mile/Lehman agreed to split off the so-called "Seven
Sisters" properties from the Five Mile/Lehman Stalking Horse Bid. [Doc. No. 1775 ¶¶ 44-46.]
This agreement was memorialized in an amended Commitment Letter and Term Sheet (the "Five
Mile/Lehman Commitment Letter and Term Sheet"). (Ex. 4 (Five Mile/Lehman Amended and
Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of
Certain Subsidiaries of Innkeepers USA Trust ("Five Mile/Lehman Commitment Letter") and
Amended and Restated Term Sheet ("Five Mile/Lehman Term Sheet"), dated Mar. 9, 2011).)
The Five Mile/Lehman Commitment Letter and Term Sheet contemplated restructuring the 64
properties that serve as collateral under the Fixed Rate Pool Mortgage Loan Agreement and the
Floating Rate Pool Mortgage Loan Agreement (the "Fixed/Floating Debtors") at a bid valued at
$970.7 million. (*Id.*)

    Section 7 of the Five Mile/Lehman Commitment Letter, entitled "Deposit,"
required Five Mile/Lehman to make a $20 million deposit and sets forth the terms and conditions
of that deposit. Among other things, Section 7 contains a liquidated damages clause, which
states:

> In the event that a Plan Sponsor [i.e., Five Mile or Lehman]
> breaches this Amended Commitment Letter and fails to close the
> Transaction as determined by a final ruling of the Innkeepers
> Bankruptcy Court (a 'Plan Sponsor Breach'), it being understood
> that the deposit shall remain in escrow pending such final
> determination, [Debtors'] sole remedy at law and in equity against
> the Plan Sponsors shall be receipt and retention of the deposit, plus
> accrued interest (if applicable), as liquidated damages.

(Ex. 4 (Five Mile/Lehman Commitment Letter, dated Mar. 9, 2011).)

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

Section 7 of the Five Mile/Lehman Commitment Letter also contained numerous

other terms and conditions regarding Five Mile/Lehman's $20 million deposit that were specific

and unique to Five Mile and Lehman.  In particular, the following italicized portions of the

following sentences in Section 7 of the Five Mile/Lehman Commitment Letter relate almost

exclusively to Five Mile and Lehman:

> [Five Mile/Lehman] shall deposit or cause to be deposited at their
> respective option, (i) cash *and/or (ii) to the extent such loans have
> been funded to the Company, a pledge from Five Mile or Lehman
> of the first portion of any recovery on account of their claims
> under the Five Mile DIP (as defined in the Term Sheet) and the
> Solar DIP (as defined in the Term Sheet), respectively
> (collectively, the 'DIP Loans'), against the respective Borrowers
> (as defined in the respective DIP Loans),* in an aggregate amount
> equal to, or having value of, $20.0 million . . . . *The responsibility
> for making the deposit shall be allocated among [Five Mile and
> Lehman] as follows:  Five Mile - 50% and Lehman - 50%.*  The
> escrow agreement shall specify that (i) on the Effective Date (as
> defined in the Term Sheet), the full amount of the cash deposit
> (with interest) deposited *(a) by Lehman shall be paid to Lehman
> and (b) by Five Mile* shall be credited against Five Mile's equity
> commitments, *and the pledge of any claims under the DIP Loans
> shall be released and revoked with respect to such pledging Plan
> Sponsor*, and (ii) upon the occurrence of a termination of this
> Commitment Letter other than due to a Plan Sponsor Breach (as
> defined below), or in the event that any of the terms and conditions
> in the Commitment Letter (including the Term Sheet) are not
> satisfied timely . . . *or the Break-Up Fee and Expense
> Reimbursement become payable to the Plan Sponsors*, the full
> amount of the deposit, plus accrued interest, shall be paid or
> returned, as applicable, to *[Five Mile and Lehman] and any pledge
> of a Plan Sponsor's claims under the DIP Loans shall be released
> and revoked.*

(*Id.* § 7.)

The Five Mile/Lehman Term Sheet also contains a "material adverse effect"

clause (the "MAE Clause"), which provides that Five Mile/Lehman may terminate the Five

Mile/Lehman Commitment Letter and Term Sheet by written notice to Debtors and Midland

upon:

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

> The occurrence of any condition, change or development that
> could reasonably be expected to have a material adverse effect on
> the business, assets, liabilities (actual or contingent), or operations,
> condition (financial or otherwise) or prospects of the
> Fixed/Floating Debtors taken as a whole; provided, however, that
> this Termination Event shall not apply to the Chapter 11 case of
> Grand Prix West Palm Beach LLC[.]

(Ex. 4 at INN-CER00039704 (Five Mile/Lehman Term Sheet, dated Mar. 9, 2011).)

**The Bidding Procedures Order**

On March 11, 2011, the Court entered an order (the "Bidding Procedures Order"

[Docket No. 1009]) approving the Five Mile/Lehman Commitment Letter as the "stalking horse"

bid and approving the Bidding Procedures (attached as Exhibit 2 to the Bidding Procedures

Order), pursuant to which the Debtors would solicit bids higher or better than the Five

Mile/Lehman Stalking Horse Bid and conduct an auction for the Fixed/Floating Debtors (the

"Fixed/Floating Auction").

Under the Bidding Procedures, April 25, 2011 was the deadline for potential

bidders to submit formal bids to become a "Qualified Bidder" at the Fixed/Floating Auction (the

"Bid Deadline"). (Bidding Procedures § 2(a).) To become a Qualified Bidder in the

Fixed/Floating Auction, bidders were required to overbid the Five Mile/Lehman Stalking Horse

Bid by at least $8 million. (*See* Bidding Procedures § 3(c)(ii)(B).) Each bidder was required to

memorialize their bid by submitting the following:

> an executed copy of any and all transaction documents necessary
> to effectuate the restructuring transactions contemplated in the Bid
> (the "Investment Documents"), a marked copy of the [Five
> Mile/Lehman Commitment Letter and Term Sheet] that reflects all
> changes proposed by the Competing Bidder, and all other material
> documents integral to such bid.

(Bidding Procedures § 2(e).)

11

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

Under the Bidding Procedures, if one or more Qualified Bids were submitted before the Bid Deadline, the Fixed/Floating Auction would be held to determine the "Successful Bidder" (the bidder with the highest or otherwise best bid) and the "Backup Bidder" (the bidder with next highest or otherwise second best bid). After the Fixed/Floating Auction, the Successful Bidder would be "required to execute and agree to the [Five Mile/Lehman Commitment Letter and the Term Sheet], and other related documents, each as modified to incorporate" the terms of the successful bid. (Bidding Procedures § 4(c).) The Backup Bidder is required to keep its bid open and irrevocable until the earlier of (a) 90 days after the Fixed/Floating Auction or (b) the closing of the transaction with the Successful Bidder; and Debtors get to keep the Backup Bidder's Deposit during such period, with an obligation to return the Deposit only upon the expiration of the Backup Bid. (Bidding Procedures § 4(e).)

As is typical of most bankruptcy auctions, the Bidding Procedures contain various provisions relating to the obligation of any competing bidder to provide a deposit and the Debtors' rights and obligations with respect thereto, including the various circumstances in which the deposit is either retained by the Debtor or returned to the bidder. Section 2(c) of the Bidding Procedures, "General Bidding Process," provides as follows:

> *Deposit:* Each Bid must be accompanied by a cash deposit in the amount of 10% of the implied value for the reorganized entity or entities contemplated in such Bid (but in no event greater than $20 million) (the "Deposit"), to an interest bearing escrow account to be identified, established, and held by and in the name of the Debtors. Additional terms and provisions regarding the Deposits are set forth in Section 8 below.

(Bidding Procedures § 2(c).)

12

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

Section 8 of the Bidding Procedures sets forth the terms and conditions of the

Deposit made by any Qualified Bidders other than Five Mile/Lehman.[2]  In the event that any bid

is not a "Qualified Bid" under the terms of the Bidding Procedures, the Debtors were required to

return the Deposit within five business days after the Bid Deadline.  In the event that a bidder at

the Fixed/Floating Auction is not the Successful Bidder or Backup Bidder, the Debtors were

required to return the Deposit within five business days after the Fixed/Floating Auction.  If the

Successful Bidder (or Backup Bidder, if applicable) timely closes the contemplated transactions,

the Deposit is credited towards its equity commitment.  Section 8 also contains the following

liquidated damages clause (the "Liquidated Damages Clause"):

> In the event the Successful Bidder (or the Backup Bidder, if
> applicable) fails to consummate the restructuring transactions
> contemplated in the Successful Bid (or Backup Bid, if applicable),
> the Debtors will not have any obligation to return the Deposit
> deposited by such Successful Bidder (or the Backup Bidder, if
> applicable). Retention of the Deposit, plus accrued interest, as
> liquidated damages, shall be the Fixed/Floating Debtors' sole
> remedy at law and in equity against the Successful Bidder (or the
> Backup Bidder, if applicable) . . . .

(Bidding Procedures § 8 (emphasis added).)  The provisions of the Bidding Procedures relating

to the obligation of any bidder to submit a Deposit, and the treatment of that Deposit under

various circumstances (including the retention of the $20 million Deposit as liquidated damages

as Debtors' "sole remedy at law and in equity"), essentially mirror the Five Mile/Lehman

Deposit provision, with the exception of those portions that are specific to Five Mile and

Lehman.  As will be discussed in greater detail below, the Deposit provisions in the Bidding

Procedures were binding on the Debtors and any bidders, and did not need to be reiterated

anywhere else.

---

[2]      Section 8 provides: "Notwithstanding anything to the contrary herein, the Deposit of Five Mile/Lehman
shall be treated as set forth in the [Five Mile/Lehman Commitment Letter]."

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

**Cerberus/Chatham Form a Joint Venture to Acquire the Fixed/Floating Debtors**

Defendant Cerberus Series Four Holdings, LLC is a private equity investment fund and an affiliate of Cerberus Capital Management, L.P. (Cerberus Series Four Holdings, LLC, Cerberus Capital Management, L.P., and all other affiliates, subsidiaries or related entities thereof, collectively, "Cerberus"). (Ex. 5 (Cerberus/Chatham Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust and Term Sheet, dated May 16, 2011).)

Defendant Chatham Lodging Trust ("Chatham") is a self-advised REIT that invests in upscale extended stay hotels and premium-branded select-service hotels. (*Id.*) Prior to its now-consummated purchase of 5 of the "Seven Sisters," Chatham owned 13 hotels in nine states. (*Id.*) Jeff Fisher is the Chairman of the Board, Chief Executive Officer and President of Chatham, as well as the chairman, president and majority shareholder of Island Hospitality Management, Inc., which provides hotel management services to all but one of the hotels owned by the Fixed/Floating Debtors.

On February 2, 2011, as part of Moelis' marketing efforts for debtors, Moelis emailed Cerberus an Innkeepers "teaser." (Ex. 6 (Email from Steven Moore to Ron Kravit, dated Feb. 2, 2011).) The "teaser" stated: "Both prior to and after approval of the Bidding Procedures, in accordance with the provisions thereof, the Company will continue to solicit other value-maximizing proposals for the sponsorship and funding of the Company's Chapter 11 plan reorganization." (*Id.* at 3.) Moelis' "teaser" also stated that "significant opportunities remain for the business in the future" and that, "[g]iven the pro-cyclical nature of the industry, hotels are expected to benefit from a broader economic recovery." (*Id.* at 4.) After receiving Moelis' teaser, Cerberus began due diligence on Innkeepers and began discussions with Chatham about

14

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

the prospects of Cerberus becoming Chatham's capital partner in a joint venture to acquire the

Fixed/Floating Debtors out of bankruptcy. (Ex. 7 (Email from Stephen Pozatek to Tom Wagner,

dated Feb. 4, 2011); Cook Dep. 92:12-21.)

      The evidence will show that, at the time Cerberus was conducting its due

diligence, Cerberus – like Moelis – believed it was an attractive time to invest in the hospitality

industry. Cerberus' investment strategy for the Fixed/Floating Debtors was to form a joint

venture with Chatham ("Cerberus/Chatham") that would acquire the Fixed/Floating Debtors,

then the joint venture would sell the Fixed/Floating Debtors' hotel assets after approximately

four years.

      On March 23, 2011, Cerberus and Chatham executed a Term Sheet (the

"Cerberus/Chatham Term Sheet") to "outline, for the purpose of further discussion, the business

understanding of the proposed terms and conditions" for a joint venture between Cerberus and

Chatham. (Ex. 8 (Cerberus/Chatham Term Sheet, dated Mar. 23, 2011).) The

Cerberus/Chatham Term Sheet provided that the principal purpose of their joint venture would

be to acquire the Fixed/Floating Debtors "pursuant to the bidding procedures outlined in the

stalking horse bid" and to "sell the [Fixed/Floating Debtors] over a five year period." (*Id.*) The

Cerberus/Chatham Term Sheet also provided that "Chatham will use its reasonable best efforts to

acquire from the Joint Venture a 100% interest in a subset of the [Fixed/Floating Debtors] listed

on Exhibit B, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . within one hundred and

twenty (120) days of the date the Joint Venture acquires the [Fixed/Floating Debtors]." (*Id.*)

**The Cerberus/Chatham Baseline Bid**

      On March 28, 2011, in accordance with Section 1(b) of the Bidding Procedures,

Cerberus/Chatham submitted to Debtors a non-binding letter of intent to acquire the

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

Fixed/Floating Debtors, which attached a term sheet demonstrating Cerberus/Chatham's ability

and willingness to submit a bid that was higher than the Five Mile/Lehman Stalking Horse Bid.

(Ex. 9 (Letter of Intent from Cerberus Real Estate Capital Management, LLC to Chatham

Lodging Trust, dated Mar. 28, 2011).)  Later that day, Adam Pieczonka from Moelis sent Marc

Beilinson, the CRO of Innkeepers, an email comparing the terms of Cerberus/Chatham's non-

binding letter of intent and the Five Mile/Lehman Commitment Letter.  (Ex. 10.)  In comparing

Five Mile/Lehman's terms to Cerberus/Chatham's terms, Mr. Pieczonka made no mention of the

Five Mile/Lehman bid containing a liquidated damages provision that was not contained in the

Cerberus/Chatham bid.  (*Id.*)  On April 1, 2011, Moelis created a Proposal Comparison, which

contains a comparative bid analysis of the Five Mile/Lehman Commitment Letter and

Cerberus/Chatham's non-binding letter of intent.  (Ex. 11 (Innkeepers USA Trust, "Proposal

Comparison," dated Apr. 1, 2011).)  This comparative bid analysis also makes no mention of the

presence or absence of a liquidated damages provision in either bid.  (*See id.*)  On April 20,

2011, the Independent Committee held a telephonic meeting, during which Mr. Beilinson

informed the Independent Committee that he expected that "the Cerberus bid would likely be on

a conforming basis" (Ex. 12 (Minutes of the Meeting of Independent Trustees of the Board of

Trustees of Innkeepers USA Trust, dated Apr. 20, 2011), which meant that Cerberus' bid would

conform to the requirements in the Bidding Procedures (Cook Dep. 60:1-16).

On April 25, 2011 (the Bid Deadline under the Bidding Procedures),

Cerberus/Chatham submitted a Commitment Letter and Term Sheet, which was the only

Qualified Bid for the Fixed/Floating Debtors (the "First Cerberus/Chatham Commitment Letter

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

and Term Sheet"),[3] and a $20 million Deposit in accordance with the Bidding Procedures. (Ex.

13.) On that same day, Cerberus/Chatham, Debtors and Wells Fargo Bank (as Escrow Agent)

entered into an Escrow Agreement which sets forth the terms and conditions under which the

Escrow Agent holds the Deposit. (Ex. 14.)

The First Cerberus/Chatham Commitment Letter and Term Sheet were prepared

and submitted in accordance with the Bidding Procedures, which required the bidder to submit

"a marked copy of the [Five Mile/Lehman] Commitment Letter and Term Sheet that reflects all

changes proposed by the Competing Bidder." (Bidding Procedures § 2(e).) The First

Cerberus/Chatham Commitment Letter contained only a few discrete categories of changes: (a)

the identity and details of the plan sponsors, (b) transaction structure, (c) elimination of

provisions unique to Five Mile/Lehman, or that related to events that had occurred prior to the

submission of the First Cerberus/Chatham Commitment Letter, and (d) price. No change was

made to the MAE Clause in the Five Mile/Lehman Term Sheet. In addition, consistent with the

Debtors' stated desire to keep the bids "apples to apples," Section 6 of the First

Cerberus/Chatham Commitment Letter incorporated the provisions of the Bidding Procedures

Order relating to the deposit: "In accordance with the Bidding Procedures Order, the Plan

Sponsors have deposited cash in an amount equal to $20 million (the "Deposit") . . . ." (*See* Ex.

13 at CE 0009409-10 (blackline showing changes Cerberus/Chatham made to Five Mile/Lehman

Commitment Letter).)

The First Cerberus/Chatham Commitment Letter contains no other discussion of

the Deposit or the treatment or application of the Deposit under varying circumstances. In

particular, the First Cerberus/Chatham Commitment Letter contains no provision addressing (a)

---

[3]   INK Acquisition LLC ("INK I"), an entity formed by Cerberus/Chatham to hold the Fixed/Floating
Debtors, is also a party to the First Cerberus/Chatham Commitment Letter and Term Sheet. For ease of reference,
the term "Cerberus/Chatham" herein includes INK I.

17

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

the type of account in which the Deposit would be held, such as an escrow or other type of

account; (b) who would own the account; (c) whether interest would be earned on the Deposit;

(d) in whose name the account would be held; (e) whether the Deposit would be subject to the

liens or claims of any creditors of the Debtors; (f) whether the Deposit would be considered

property of the Debtors' estates; (g) what would happen to the Deposit in the event that the

Cerberus/Chatham Commitment Letter was not deemed to be a Qualified Bid; (h) what would

happen to the Deposit in the event that Cerberus/Chatham was not declared the Successful

Bidder or the Backup Bidder; (i) whether the Deposit would be credited towards

Cerberus/Chatham's equity commitment at closing if Cerberus/Chatham were declared to be the

Successful Bidder (or the Backup Bidder, if applicable); (j) what would happen to the Deposit in

the event Cerberus/Chatham, if declared to be the Successful Bidder (or the Backup Bidder),

failed to consummate the restructuring transactions contemplated in the Successful Bid (or the

Backup Bid, if applicable) because of a breach or failure to perform; or (k) whether retention of

the Deposit, as liquidated damages, would serve as Debtors' sole remedy at law or in equity in

the event Cerberus/Chatham, if declared the Successful Bidder or Backup Bidder, breached or

failed to perform. (Manzo Report at 13-14.)

Instead, the First Cerberus/Chatham Commitment Letter provides that

Cerberus/Chatham made the Deposit "[i]n accordance with the Bidding Procedures." The

Bidding Procedures specifically address the treatment and application of the Deposit in the

varying circumstances listed above. In particular, with regard to the Deposit, the Bidding

Procedures provide:

- the Deposit must be held in an escrow account (Bidding Procedures § 2(a));
- the escrow account must be held by Debtors (Bidding Procedures § 2(a));
- the Deposit must bear interest in the escrow account (Bidding Procedures

18

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

§ 2(a));

- the escrow account must be held in the Debtors' name (Bidding Procedures § 2(a));

- the Deposit shall not be subject to the liens or claims of any creditors of the Debtors (Bidding Procedures § 8);

- the Deposit would not be considered property of the Debtors' estates (Bidding Procedures § 8);

- in the event that the Cerberus/Chatham Commitment Letter was not deemed to be a Qualified Bid, the Deposit would be returned within five business days after the Bid Deadline (Bidding Procedures § 8);

- in the event that Cerberus/Chatham was not declared the Successful Bidder or the Backup Bidder, the Deposit would be returned within five business days after the Fixed/Floating Auction (Bidding Procedures § 8);

- in the event that Cerberus/Chatham were declared to be the Successful Bidder (or the Backup Bidder, if applicable) and closed, the Deposit would be credited towards its equity commitment at closing (Bidding Procedures § 8); and

- in the event that Cerberus/Chatham, if declared to be the Successful Bidder (or the Backup Bidder), failed to consummate the restructuring transactions contemplated in the Successful Bid (or the Backup Bid, if applicable) because of a breach or failure to perform, retention of the Deposit, as liquidated damages, would serve as Debtors' sole remedy at law or in equity (Bidding Procedures § 8).

After Cerberus/Chatham submitted the First Cerberus/Chatham Commitment Letter and Term Sheet, Debtors negotiated for certain changes to Cerberus/Chatham's Commitment Letter,[4] none of which affected Section 6 of the Commitment Letter (the Deposit provision) or the MAE Clause in the Term Sheet. In those negotiations, Debtors never raised any issue with Section 6 of the First Cerberus/Chatham Commitment Letter, nor did Debtors ever say that, in their view, Cerberus/Chatham waived the Liquidated Damages Clause. During those negotiations, Midland's counsel (not the Debtors) requested that an integration clause be included in the Commitment Letter. (Ex. 15 (Email from Jonathon Zinman to Stuart Freedman,

---

[4]       In particular, Debtors insisted that Cerberus/Chatham put back the "fiduciary out" provision in the Cerberus/Chatham Term Sheet, which Cerberus/Chatham had proposed to delete.

19

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

et al., dated Apr. 27, 2011).) The request did not suggest that the clause was in any way meant to

somehow preclude applicability of the Bidding Procedures Order, but rather simply mentioned

the fact that there had been an integration clause in the Five Mile/Lehman Commitment Letter.

(*Id.*) As a result of those negotiations, on April 27, 2011, Cerberus/Chatham submitted a revised

Commitment Letter dated April 25, 2011 (the "Second Cerberus/Chatham Commitment Letter").

(Ex. 16.) The Second Cerberus/Chatham Commitment Letter added the integration clause that

Midland, not the Debtors, had requested.    In particular, Section 15 of the Second

Cerberus/Chatham Commitment Letter (the "Integration Clause") provides:

> Entire Agreement.  This Commitment Letter and the Term Sheet,
> together with the Appendices and Exhibits thereto, represent the
> entire understanding and agreement among the parties hereto with
> respect to the subject matter hereof and supercedes all prior and
> contemporaneous agreements and understandings among the
> parties hereto, both written and oral, with respect to the subject
> matter hereof.

(*Id.*) The Integration Clause in the Second Cerberus /Chatham Commitment Letter,

appropriately, resulted in the non-binding letter of intent submitted on March 28, 2011 and the

First Cerberus/Chatham Commitment Letter between the parties being superseded.  By its own

terms, however, the Integration Clause did not operate to supersede the Bidding Procedures

Order that had previously been entered by the Court before Cerberus/Chatham was even

involved and was (by Debtors' own admission) not an "agreement or understanding among the

parties."

On April 27, 2011, Moelis created a "Proposal Comparison Summary," which

contains comparative bid analyses of the bids submitted by Five Mile/Lehman,

Cerberus/Chatham and TPG/York, which compares the bids' price terms and any other

differences that Innkeepers thought were "significant." (Ex. 17 (Innkeepers USA Trust,

"Proposal Comparison Summary," dated Apr. 27, 2011); Cook Dep. 69:17-70:12.) Notably, in

20

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

the Proposal Comparison Summary, Moelis does not mention any purported difference between

the bids with regard to liquidated damages. (*See* Ex. 17.) Also on April 27, 2011, Innkeepers'

Board of Trustees held a telephonic meeting, during which "Mr. Beilinson informed the Board

that they had received a proposal from a joint venture between Cerberus Capital Management,

L.P. and Chatham Lodging Trust that constituted a conforming 'overbid' <u>pursuant to the terms of</u>

<u>the bidding procedures approved by the Bankruptcy Court</u>." (Ex. 18 (Innkeepers USA Trust

Board of Trustees Meeting Minutes, dated Apr. 27, 2011) (emphasis added).) At that board

meeting, Mr. Beilinson never mentioned the Debtors' newly-minted litigation position that

Cerberus/Chatham's "overbid" allegedly lacked a liquidated damages provision, contrary to the

Court-approved Bidding Procedures Order. (*See id.*; Beilinson Dep. 144:17-22.)

On April 28, 2011, following more negotiations between the parties,

Cerberus/Chatham further revised its Term Sheet by agreeing to insert a "Fiduciary Out"

provision that was identical to the one in the Five Mile/Lehman Term Sheet. (Exs. 19 & 20.)

During these negotiations, Debtors' counsel made it clear that, aside from price, Debtors

intended the bids submitted by Five Mile/Lehman and Cerberus/Chatham to have the same

material terms. (Ex. 20 (Email from Brian Lennon to Stuart Freedman, et al., dated Apr. 29,

2011 ("Our intent is for the deals to track each other.")).)

On April 29, 2011, Debtors named Cerberus/Chatham's bid for the Fixed/Floating

Debtors as the baseline bid for the Fixed/Floating Auction in accordance with the Bidding

Procedures (the "Cerberus/Chatham Baseline Bid"). (Ex. 21.) The Cerberus/Chatham Baseline

Bid had an implied value of $978.7 million (including approximately $622.5 million of debt

financing and approximately $356.2 million of equity investment by Cerberus/Chatham). (*Id.*)

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

**The Fixed/Floating Auction**

With the selection of the Cerberus/Chatham Baseline Bid, on May 2, 2011,

Debtors proceeded with the Fixed/Floating Auction in accordance with the Bidding Procedures

Order. [Doc. No. 1775 ¶ 52.] Throughout the Fixed/Floating Auction, counsel for Debtors

repeatedly made clear that the auction was being conducted subject to and in accordance with the

Bidding Procedures. Indeed, counsel for Debtors stated on the record that "[t]he debtors are

administering today's auction with respect to the fixed and floating hotels pursuant to those [bid]

procedures." (Ex. 34 (Transcript of Fixed/Floating Auction, May 2, 2011, at 13); *see also, e.g.,*

*id.* at 14 ("As the Bid Procedures set forth, by submitting a bid you are confirming that you will

be abiding by the Bid Procedures that have been approved by the Court[.]").) And, upon

submission of Cerberus/Chatham's initial bid at the auction, counsel for Cerberus, at the request

of Debtors' counsel, confirmed on the record that the bid was submitted in accordance with the

Bidding Procedures. (*Id.* at 19; *see also* Cook Dep. 87:2-3; Derrough Dep. 189:18-21.)

After twelve rounds of competitive bidding between Five Mile/Lehman and

Cerberus/Chatham, Debtors closed the auction and declared Cerberus/Chatham the Successful

Bidder pursuant to the Bidding Procedures after a bid from Cerberus/Chatham valued at

approximately $1.12 billion went unchallenged. [Doc. No. 1775 ¶ 52.] At no time during the

auction did the Debtors take the position – or say to the competing bidders – that a material

difference existed between the Cerberus/Chatham Baseline Bid and the Five Mile/Lehman

Commitment Letter, in that only the latter contained a limitation on the Debtors' remedies in the

event of a breach or failure to perform. In fact, Debtors admit that they never told Five Mile,

Lehman, Midland, the Creditors Committee or even the Board of Trustees that

Cerberus/Chatham had purportedly waived liquidated damages. (Beilinson Dep. 144:17-145:8,

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

146:13-147:6, 153:23-154:5, 249:18-250:14; Derrough Dep. 38:15-39:39, 41:17-24.) Nor did

Debtors ever tell Cerberus/Chatham that Debtors were of the view that Cerberus/Chatham had

waived liquidated damages. (Beilinson Dep. 249:18-24.)

       In the days immediately following the Fixed/Floating Auction, in accordance with

the Bidding Procedures Order, Cerberus/Chatham began negotiating modifications to the Second

Cerberus/Chatham Commitment Letter and Term Sheet to reflect the outcome of the

Fixed/Floating Auction. On May 16, 2011, Cerberus/Chatham entered into the Amended and

Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of

Certain Subsidiaries of Innkeepers USA Trust (the "Commitment Letter") and Amended and

Restated Term Sheet (the "Term Sheet").[5] (Ex. 5 (Commitment Letter and Term Sheet).) The

Commitment Letter and Term Sheet are governed by New York law. (Commitment Letter § 10.)

After the parties executed the Commitment Letter, Debtors heralded the agreement as "yield[ing]

approximately $154 million in value over and above the Five Mile/Lehman stalking horse bid"

(Disclosure Statement at 3 [Doc. No. 1208]), but never claimed in any public statement that the

Commitment Letter had somehow waived or "deleted" the Liquidated Damages Clause in the

Bidding Procedures.

       Like prior versions, Section 6 of the Commitment Letter, which governs

Cerberus/Chatham's $20 million Deposit, provides: "Deposit. In accordance with the Bidding

Procedures Order, [Cerberus/Chatham] have deposited cash in an amount equal to $20 million

(the 'Deposit') to [the escrow agent]." (Commitment Letter § 6 (emphasis added)). By making

the Deposit, "in accordance with the Bidding Procedures," Cerberus/Chatham incorporated by

reference the Deposit provisions in the Bidding Procedures, including the Liquidated Damages

---

[5]     INK I and INK Acquisition II LLC ("INK II") (INK I and INK II, collectively, "New HoldCo"), entities
formed by Cerberus/Chatham to hold the Fixed/Floating Debtors, are also parties to the Commitment Letter and
Term Sheet. For ease of reference, "Cerberus/Chatham" as used herein includes New HoldCo.

23

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

Clause, which provides that if the Successful Bidder (in this case Cerberus/Chatham) breaches

the Commitment Letter, retention of the $20 million Deposit as liquidated damages shall be the

Fixed/Floating Debtors' "sole remedy at law or in equity."

Section 16 of the Commitment Letter provides that in the event that the

Commitment Letter is terminated, "the following agreements and obligations of the parties shall

survive such termination and shall continue in full force and effect for the benefit of the parties

hereto in accordance with the terms hereof: . . . [Section] 6 (Deposit) . . . ." By providing that

Section 6 – the Deposit provision – survives termination of the Commitment Letter, Section 16

reflected that the Deposit provision in Section 6 was meant to do more than provide for the

making of the Deposit, which already had occurred. It incorporated the terms of the Bidding

Procedures Order with respect to the Deposit.

In fact, Section 11 of the Commitment Letter expressly provides for how disputes

arising from the Bidding Procedures should be resolved: "Each of the parties hereto hereby

irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction

of the Innkeepers Bankruptcy Court, in any action or proceeding arising out of or relating to . . .

the construction and enforcement of the Bidding Procedures Order . . . ."

Section 15 of the Commitment Letter contains the following Integration Clause:

> Entire Agreement. This Amended and Restated Commitment
> Letter and the Amended and Restated Term Sheet, together with
> the Appendices and Exhibits thereto, represent the entire
> understanding and agreement between the parties hereto with
> respect to the subject matter hereof and supercedes all prior and
> contemporaneous agreements and understandings among the
> parties hereto, both written and oral, with respect to the subject
> matter hereof, including without limitation the Commitment Letter
> and Term Sheet dated April 25, 2011 by the Plan Sponsors and
> New HoldCo. [i.e., Cerberus/Chatham].

24

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

(Commitment Letter § 15.) While the Integration Clause expressly referenced the fact that – as

one would expect – it superseded the prior Commitment Letter and Term Sheet, no mention is

made of the Bidding Procedures Order being superseded. To the contrary, as discussed above,

Section 11 of the Commitment Letter expressly provides for the <u>enforcement</u> of the Bidding

Procedures.

The Term Sheet contains the following "material adverse effect" clause (the

"MAE Clause"), which provides that Cerberus/Chatham may terminate the Commitment Letter

and Term Sheet by written notice to the Debtors and Midland upon:

> The occurrence of any condition, change or development that
> could reasonably be expected to have a material adverse effect on
> the business, assets, liabilities (actual or contingent), or operations,
> condition (financial or otherwise) or prospects of the
> Fixed/Floating Debtors taken as a whole; <u>provided</u>, <u>however</u>, that
> this Termination Event shall not apply to the Chapter 11 case of
> Grand Prix West Palm Beach LLC[.]

(Term Sheet at 7.)

Debtors never provided Five Mile, Lehman, Midland, the Creditors Committee or

the Board of Trustees with any comparative bid analysis or similar analysis identifying the

presence or absence of a liquidated damages provision as a difference between the Five

Mile/Lehman Commitment Letter and the Cerberus/Chatham Commitment Letters. (Ex. 22 (Ltr.

from Howard W. Schub to Adam Harris, dated Sept. 16, 2011); Ex. 23 (Ltr. from John D. Penn

to Adam Harris, dated Sept. 25, 2011); Ex. 34 (Ltr. from Kevin J. O'Brien to Adam Harris, dated

Sept. 23, 2011).) Debtors also never advised Five Mile, Lehman, Midland, the Creditors

Committee or the Board of Trustees that the Cerberus/Chatham Commitment Letters constituted

a "higher or better" bid as a result of either the removal of the reference to the liquidated

damages provision of the Five Mile/Lehman Commitment Letter, or the waiver of the right to

rely on the liquidated damages provision in the Bidding Procedures. (*Id.*; Beilinson Dep.

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

144:17-145:8, 146:13-147:6, 153:23-154:5, 249:18-250:14; Derrough Dep. 38:15-39:39, 41:17-

24.)  From the Debtors' viewpoint, Cerberus/Chatham's bid was the "best" bid – not because of

any purported waiver or deletion of the liquidated damages provision – but rather because "they

offered the most – the highest number of dollars in economic terms for the assets."  (Cook Dep.

77:21-23.)  Indeed, according to Innkeepers' CFO, other than price, there was nothing that made

Cerberus/Chatham's bid better than Five Mile/Lehman's bid.  (Cook Dep. 85:2-12.)

**Disclosure Statement Hearing and the Confirmation Hearing**

After the Fixed/Floating Auction, Debtors filed an amended disclosure statement

(the "Disclosure Statement") reflecting changes as a result of the auction and the Commitment

Letter.  (Disclosure Statement for Debtors' Plans of Reorganization, May 19, 2011 [Doc. No.

1444].)  The Disclosure Statement and related plan of reorganization (the "Fixed/Floating Plan")

reflect the terms of the Commitment Letter and Term Sheet.  (Debtors' Plans of Reorganization,

June 29, 2011 [Doc. No. 1799].)  At the hearing on the adequacy of the Disclosure Statement,

there was no mention of the alleged absence of a liquidated damages provision in the

Commitment Letter or Term Sheet.  The absence of such disclosure is material in light of the fact

that the Five Mile/Lehman Stalking Horse Bid initially approved by the Bankruptcy Court, as

well as the Bidding Procedures, presumptively would have resulted in the Successful Bid also

containing a liquidated damages provision.  (Manzo Report at 17.)  A purported waiver or

deletion of a liquidated damages provision is certainly information that would have been

disclosed to the Bankruptcy Court as a material benefit to the Debtors.  (*Id.*)  By order dated May

19, 2011, the Court approved the Disclosure Statement.  [Doc. No. 1441.]

On June 29, 2011 the Court entered an order confirming Debtors' Plan of

Reorganization (the "Confirmation Order") [Doc. No. 1804].  In the Confirmation Order, the

26

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

Court ordered that "the Commitment Letter, and all documents related thereto, reflecting the terms of the Fixed/Floating Successful Bid, shall be binding in all respects upon . . . the Cerberus/Chatham Fixed/Floating Plan Sponsors, New HoldCo, . . . the Fixed/Floating Debtors and their respective affiliates and subsidiaries." (Confirmation Order ¶ 140 [Doc. No. 1804].)

On June 23, 2011, the Bankruptcy Court held a confirmation hearing with respect to the Fixed/Floating Plan. (June 23, 2011 Confirmation Hearing Transcript [Doc. No. 1854].) Again, Debtors did not bring to the attention of the Bankruptcy Court any purported waiver or deletion by Cerberus/Chatham of the Liquidated Damages Clause in the Bidding Procedures.

During the period after the Commitment Letter and Term Sheet were executed, the parties worked towards a planned closing date of August 5, 2011. (*See* Aug. 2, 2011 Hearing Tr. at 5 [Doc. No. 1986].)

## U.S. Economic Conditions Deteriorated Significantly After May 16, 2011

As detailed below, since May 16, 2011, the date on which Cerberus/Chatham executed the Commitment Letter, and particularly beginning in late July 2011, a series of unforeseeable, unprecedented and materially adverse economic developments occurred that could reasonably be expected to have and, in fact, have had, a material adverse effect on, among other things, the assets, business, operations and prospects of the Fixed/Floating Debtors. Such events included: (1) U.S. economic conditions deteriorated significantly; (2) reduced U.S. GDP projections; (3) widespread reports of a possible "double dip" recession; (4) a 30-40% decline in the equity market value of comparable lodging operators; (5) S&P's downgrade of the United States' credit rating; (6) downgraded expectations regarding lodging industry prospects; (7) analysts revising their revenue forecasts for the lodging sector down substantially; (8)

27

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

expectations about disruptions in hotel asset sales; and (9) severe tightening in the capital

markets.

       During the first part of 2011, the U.S. economy improved as the country

recovered from the worst post-Depression economic downturn.  (Fischel Report ¶ 11.)  Starting

in late July 2011, however, the U.S. economic outlook deteriorated sharply as the U.S. and world

economies were hit with a series of shocks that caused economists to downgrade their forecasts

of future economic activity, including, among other things, (1) political turmoil in the United

States over raising the debt-ceiling, which shook consumer and business confidence;[6] (2) for the

first time in U.S. history, S&P downgraded U.S. debt below AAA; (3) the release of economic

data that revealed that the recession had been deeper, and the recovery weaker, than previously

thought; (4) concerns about a wide-ranging debt crisis increased over concerns about potential

sovereign debt defaults; (5) revised forecasts of an increased risk of unemployment and a double-

dip recession; and (6) reduced forecasts of GDP growth and other indicators.  (Fischel Report

¶¶ 11-17.)  Nouriel Roubini, a noted New York University economist, put the dire state of the

economy in the following context:  "the world is worse off now than in 2008, when financial

crises gripped the world and credit markets froze."  Forrest Jones, *Goldman Sachs Report Warns

of New Financial Crisis*, Moneynews, Sept. 5, 2011.

---

[6]     Analysts at Bank of America Merrill Lynch wrote that:

>       From the market lows in March 2009 until the peak in May 2011, global equity
>       prices staged a vigorous cyclical recovery.  Since then, it has been a very rough
>       summer for equities, with almost 30 global equity markets entering bear
>       markets.  The catalyst for the August collapse was the messy US debt ceiling
>       debate.  But BofAML equity strategists believe the real reasons for the decline
>       were worries about recession risks, the lack of confidence over the ability (and
>       willingness) of policy makers to respond, fears of a banking crisis in Europe,
>       and contagion across asset classes as leveraged investors unwound risk assets to
>       move into bonds.

Bank of America Merrill Lynch, *U.S. REIT Weekly, Summer of Decline for Global Equity Markets*, Sept. 16, 2011,
at 1.

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

Economic data released in July 2011 revealed that the recession had been deeper

and the recovery weaker than previously thought:

> Economic data released over the past month was for the most part
> downbeat.  BEA now estimates that the 2007-2009 recession was
> not only deeper than previously assumed but that the recovery to
> date has been weaker, with real GDP growth actually decelerating
> in the second year of recovery to a year-over-year pace of just
> 1.6% as of Q2 2011.  In contrast real GDP grew 5.6% during the
> second year of recovery following the 1981-82 recession.

Blue Chip Economic Indicators, *Top Analysts' Forecasts of the U.S. Economic Outlook For the*

*Year Ahead*, Vol. 36, No. 8, Aug. 10, 2011, at 1.  From May 16, 2011 to August 19, 2011, the

S&P 500 fell 15%.  (Fischel Report Ex. C.)

Economists slashed their forecasts of U.S. economic growth in reaction to the

troubling news that was coming out and believed that downside risks to growth had increased.

Forecasts for GDP growth and for nonresidential investment fell, while forecasts of

unemployment increased.  Blue Chip Economic Indicators, *Top Analysts' Forecasts of the U.S.*

*Economic Outlook For the Year Ahead*, Vol. 36, No. 8, Aug. 10, 2011, at 1 ("Nonresidential

investment is predicted to grow 6.8% in 2012, a percentage point less than estimated last month.

The consensus now believes the unemployment rate will average 8.7% next year, half a

percentage point higher than estimated a month ago.").  In early August, it became clear that job

creation also had slowed:

> Job creation over the past three months slowed noticeably
> compared to the prior three-month period and the unemployment
> rate has risen from 8.8% in March to 9.1% in July.  Further
> confirmation of labor market softness came from the Challenger
> survey that reported job cut announcements by major employers
> jumped in July to their highest level since March 2010.

*Id.*

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

Moreover, consumer confidence declined in July and August 2011 in connection

with the battle over the U.S. debt ceiling and S&P's downgrade:

> The bruising battle over raising the U.S. debt ceiling and
> subsequent decision by Standard & Poor's to cut America's AAA
> credit rating has also served to undermine panelists' forecasts of
> economic growth by serving to depress consumer and business
> confidence and altering perceptions about how restrictive Federal
> fiscal policy may become over the forecast horizon.  Consumer
> confidence has plunged to recessionary levels, undercutting
> forecasts of how much consumer spending will rebound from the
> subdued Q2 pace.  Surveys of business confidence also tumbled in
> reaction to the display of political paralysis in Washington, further
> dampening expectations for hiring and investment.

Blue Chip Economic Indicators, *Top Analysts' Forecasts of the U.S. Economic Outlook For the*

*Year Ahead*, Vol. 36, No. 9, Sept. 10, 2011, at 1.

Blue Chip Economic Indicators, a newsletter that has systematically collected and

summarized forecasts of U.S. economic activity by a large number of business economists since

1976, reported the results of their early August 2011 survey which showed that the broad mix of

bad economic news had caused many economists to believe that the chance of a double-dip

recession had increased substantially:

> As the economic data continue to disappoint, we become more
> worried about the strength of the recovery.  We took a sledge
> hammer to our forecasts recently, and now look for below-
> potential growth through the end of next year.  A lower growth
> trajectory brings greater risk of dipping into recession.  We now
> believe there is a 35% chance of a recession in the next year, about
> double where we put the odds this spring.  We argue that after a
> series of sucker punches earlier this year, the economy is only one
> shock away from falling into recession. . . .
>
> Ever since the GDP data were revised down on July 29th a chart
> has made the rounds showing that every time real GDP growth has
> decelerated to less than 2 percent on a year-to-year basis (as it did
> between Q2 2010 and Q2 2011) the economy has either already
> been in recession or fallen into one within a year.  The record is
> not very comforting. . . .

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

At a minimum, the conditions are ripe for a recession. . . .

The risks of a shock that could send the economy into a recession
are unusually high today.

(*Id.* at 15.)

The effects of the events of late July and early August were subsequently

confirmed.  Blue Chip Economic Indicators' September 1-2 survey reflected that economists had

reduced their forecasts further in August and that fear of another recession had increased:

The forecast of y/y growth in 2012 dropped for a fourth straight
month and sits a full percentage point beneath its May level.
Moreover, most analysts believe the fragile nature of the recovery
has made it vulnerable to shocks and or policy mistakes, both
domestic and foreign, that might tip the economy back into
recession.  As a result, consensus odds of a recession by the end of
next year increased this month to slightly more than one-in-three, a
level that in the past has been associated with at a minimum a
below trend-rate pace of economic growth. . . .

The consensus estimate of y/y real GDP growth in 2012 dropped
0.3 of a percentage point this month to 2.2%.  The unemployment
rate is now expected to average 8.9% in 2012, 0.2 of a percentage
point greater than a month ago. . . .

Blue Chip Economic Indicators, *Top Analysts' Forecasts of the U.S. Economic Outlook For the*

*Year Ahead*, Vol. 36, No. 9, Sept. 10, 2011, at 14.

## The Fixed/Floating Debtors Have Had an Even Larger Decline in Their Business, Assets, and Prospects Than the Overall Market

### Lodging REITs Suffered Even Larger Declines in Value Than Did the Overall Market.

The Bloomberg REIT Hotels Index, which is based on hotel properties

comprising 75% or more of invested assets, declined substantially – by 34% – from May 16

through August 19, 2011 and far more than the S&P 500, with essentially all the decline

occurring in late July and early August 2011.  (Fischel Report ¶ 19 & Ex. I.)  Even Debtors'

31

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

expert, John B. Corgel, Ph.D repeatedly acknowledges in his expert report that there was a "drop in securitized market prices" for hotel REIT prices. (Corgel Report at 18, 19, 20.)

One of the basic principles of financial economics is that the market value of an enterprise's assets reflects the value of the future cash flows or prospects of its business. (Fischel Report ¶ 20.) Because the analysis is by definition forward-looking, the value of an asset today is determined by how the asset is expected to perform in the future. (Fischel Report ¶ 21.) Consequently, the recent collapse in lodging REIT market values demonstrates the present expectation that there will be a severe deterioration in the future business performance of the the Fixed/Floating Debtors (and hence their "prospects") even if there is has been no significant short-term shortfall in performance. (Fischel Report ¶¶ 20-21.) An examination of the performance of companies most closely comparable to the Fixed Floating Debtors after May 16, 2011 shows a sharp decline in share prices, primarily in late July and early August 2011. (Fischel Report ¶ 22.) This decline for comparable companies was even more severe than the decline in the S&P 500. (*Id.*)

Industry Observers Became Significantly More Pessimistic About
the Lodging Industry's Business, Assets and Prospects

Consistent with the collapse in market values, lodging industry analysts became significantly more pessimistic about the business, assets, and prospects of the lodging industry in response to the economic downturn. Analysts at Goldman Sachs wrote on August 11, 2011 that macroeconomic volatility, credit disruption, and declining GDP growth rates, among other things, prompted them to reduce their forecasts for the lodging industry:

> In recent weeks, REIT stocks have experienced heightened
> volatility, reminiscent of the prior downturn in 2008 when credit
> became severely disrupted and growth rates declined sharply. In
> the current cycle, the combination of a deteriorating macro outlook
> (slowing GDP growth) and lower rates for longer (until mid-2013

32

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

> at a minimum) have caused us to discount near-term growth
> expectations, incorporate the risk of rising funding costs and cap
> rates, and ascribe lower multiples as concerns over another
> recession increase. . . . As a result of the reduced GDP growth
> forecasts and greater uncertainty, we make several stock rating
> changes, reduce estimates selectively, and adjust price targets
> lower for most names.

Goldman Sachs, *Americas: Real Estate: REITs*, Aug. 11, 2011, at 2.

The macro-economic downturn came as corporate lodging contracts for 2012

were being negotiated, and analysts became concerned the downturn might disrupt recent

positive rate momentum.  Analysts at Morgan Stanley wrote on August 26 that:

> We are reducing our lodging estimates to reflect slower
> macroeconomic growth.  We believe it is increasingly likely the
> recent macro uncertainty will disrupt recent rate momentum,
> especially as corporate-transient rates for 2012 begin to be re-
> negotiated for 2012 this fall.

Morgan Stanley, *Lodging: Lowering Estimates on Macro Uncertainty; Downgrade HOT*, Aug.

26, 2011, at 2.

The economic downturn prompted downward revisions to "downside" or "bear"

scenarios as analysts became more concerned that the lodging industry could deteriorate

substantially because of its vulnerability to a weak economy.  For instance, lodging analysts at

Barclays Capital wrote on August 19 that:

> Given the uncertain global macroeconomic outlook and the
> vulnerability of our coverage universe to a weak economy, we are
> revising our "downside case" scenarios for all of the stocks in our
> coverage universe. . . . Our downside case scenarios assume
> slowing trends in 2H and more severe deterioration in 2012, often
> using 2009 metrics to determine our 2012 stress-tested forecasts.

Barclays Capital, *U.S. Gaming, Lodging & Leisure: Examining the Downside*, Aug. 19, 2011 at

1.

33

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

In the lodging industry, revenue per available room ("RevPAR") is one of the

most widely used performance metrics, and the sharp decline in GDP expectations led analysts to

substantially revise their estimates of RevPAR growth.  (Fischel Report ¶ 26 & Ex. K.)  Analysts

at Raymond James explained that:

> We are cutting our 2011-2012 industry and company-specific
> RevPAR growth expectations to reflect what has become a
> decidedly more cautious domestic and international economic
> growth outlook.  Consequently, we are also lowering earnings
> estimates and price targets (where applicable).  We believe that
> lodging stocks have already discounted much of the potential
> macro-driven downside, with shares trading at valuations that
> across several metrics are very near their early 2009 levels.

Raymond James, *Lodging: Lowering Estimates on Economic Concerns; Stock Values Attractive,*

Aug. 31, 2011, at 1.  Analysts at Goldman Sachs have a similarly bleak outlook for RevPAR:

> In order to reflect a weakening macroeconomic environment we
> are lowering our overall 2012 RevPAR forecast to 4%-5% from
> 5%-7%.  Our 2013 RevPAR forecast is also 4%-5%. . . . The major
> risk to our Attractive coverage view remains the economy going
> back into a recession. . . . Many investors we have spoken to
> recently are generally looking for flat if not negative RevPAR
> growth in 2012 given economic fears.

Goldman Sachs, *Americas: Lodging: Cycle Not Over; Aligning PT's/Estimates for More Modest*

*Economy*, Sept. 12, 2011, at 1-3.

Analysts also downgraded their forecasts for 2011 and subsequent years for

companies comparable to the Fixed/Floating Debtors (Hersha, Summit Hotel Properties Inc. and

RU), especially after late July, 2011.  For instance:

- Janney Capital Markets analysts reduced 2011, 2012, and 2013 RevPAR growth forecast for Hersha to 6.7, 6.0, and 8.0 percent, respectively, from 8.5, 9.5, and 9.0 percent, respectively.  Janney Capital Markets, *Starwood Capital Buys a Little More from Hersha; Reiterate BUY*, Aug. 18, 2011, at 1.

- Based on "fears of a double-dip recession and a potential slowdown in the credit markets," Janney Capital Market analysts reduced their FFO/sh (funds from operations per share) estimates for Summit Hotel Properties Inc. for 2011, 2012, and 2013 to $0.73, $0.86, and $1.05, respectively, from $0.79,

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

$1.05, and $1.26, respectively. Janney Capital Markets, *Growth Mode in Limbo, But Yield Story Still Intact; Reiterate BUY*, Aug. 23, 2011, at 1.

- Based on "a more cautious RevPAR growth pace," analysts at Wells Fargo Securities reduced their 2012 and 2013 estimates of FFO/sh for RU to $1.66 and $1.89, respectively, from $1.76 and $2.10, respectively. Wells Fargo Securities, *RLJ: Acquisitions to Accelerate - Adj. Ests., Valuation Range*, Aug. 11, 2011 at 1.

Lodging Asset Sales Were Expected to Be Disrupted

Analysts expected the economic downturn to disrupt asset sales in the lodging industry. For instance, analysts at Morgan Stanley wrote: "Large scale asset dispositions seem less likely near-term given the state of the equity and debt capital markets." Morgan Stanley, *Lodging: Lowering Estimates on Macro Uncertainty; Downgrade HOT*, Aug. 26, 2011, at 8. Analysts at Raymond James agree that sales of hotel assets will stagnate given the current economic climate:

> Recent discussions with hotel brokers point to a growing inventory of hotel assets for sale. Indeed, the number of hotels testing the market today is at a new cyclical high. At the same time, private equity buyers, who had just recently stepped up their interest, appear to have pulled back. REITs, which have been the dominant buyer of hotels during the last 18 months, also seem to be throttling back their near-term interest. This is not surprising, of course, as underwriting the economic landscape has gotten tougher, the cost of equity has risen dramatically, and lenders' debt yield requirements have increased 200 bp lately. Assets that were under letter of intent (LOI) but which failed to close are being marked down by about 10% but still may founder.

Raymond James, *Lodging: Lowering Estimates on Economic Concerns; Stock Values Attractive*, Aug. 31, 2011, at 2. These disruptions in the market for lodging assets reduced liquidity in the market for lodging assets, and this reduction in liquidity further reduced the value of lodging assets as sellers faced a thinner market where it was more difficult to sell assets in a reasonable amount of time on reasonable terms. (Fischel Report ¶ 30.)

35

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

The Current Collapse in the Business, Assets, and Prospects
of the Fixed/Floating Debtors Mirrors Historical Experience

The current collapse in the business, assets, and prospects of the Fixed/Floating

Debtors is consistent with historical experience in the lodging industry following economic

downturns. (Fischel Report ¶ 32 & Ex. L.)  For example, a comparison of U.S. real GDP and

changes in real RevPAR over the past 30 years shows that changes in real RevPAR have been

closely related to changes in real GDP.  (*Id.*)  The relation is especially strong when real GDP

growth turns down, as it did in 1991, 2001, and 2008-09.  (Fischel Report ¶ 33.)  For instance, in

2001, real GDP growth declined to 1.1% from 4.1% in 2000.  (*Id.*)  Over that same period, real

RevPAR growth fell to -8.4% from 3.4%.  (*Id.*)  Moreover, real RevPAR growth has plunged

even when real GDP growth has merely slowed.  (*Id.*)  In 2001, real GDP slowed to a rate of

1.1% per year, but did not fall below zero.  (*Id.*)  Real RevPAR growth, however, fell

dramatically that year, so that real RevPAR actually shrank by 8.4% from 2000 to 2001.  (*Id.*)

Because of this historical experience, industry analysts commonly use models

based on economic factors to forecast lodging industry performance.  For instance, analysts at

Morgan Stanley use a proprietary regression model and economic factors to forecast RevPAR.

Morgan Stanley, *Lodging: Lowering Estimates on Macro Uncertainty; Downgrade HOT*, Aug.

26, 2011, at 23.  Applying their model in the current environment given the severe economic

downturn, Morgan Stanley has reduced its estimates of future RevPAR growth for 2012 by 29%.

*Id.*  Morgan Stanley also warns that "should economic forecasts surprise to the downside (as has

been the recent trend), our model would forecast lower RevPAR growth," and that, as they

highlighted in their "Bear Case," "should we see a scenario of negative employment and

business spend growth, our model predicts RevPAR would turn negative."  *Id.*

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

**Cerberus/Chatham Declares a Material Adverse Effect**

As noted above, the parties had been working toward Friday, August 5, 2011 as the closing date for the consummation of the transaction contemplated in the Commitment Letter and Term Sheet. However, on that day, as news swirled of the market's volatility, Cerberus – fearing a possible economic meltdown – decided to postpone the closing in order to consider the impact that the sudden economic downturn would have on the Fixed/Floating Debtors. (Ex. 25 (Email from Stuart Freedman to Todd Schwartz, et al., dated Aug. 5, 2011.) Then, at the close of business on August 5, 2011, S&P took the unprecedented step of downgrading certain credit ratings of the United States. Press Release, *Standard & Poor's, S&P Downgrades U.S. Debt Rating* (Aug. 5, 2011).

The evidence will show that over the course of the next week, Cerberus/Chatham carefully studied market conditions and assessed the impact that the recent sharply negative macroeconomic events could reasonably be expected to have on the Fixed/Floating Debtors. Moreover, the evidence also will show that Cerberus relied on its experience owning hospitality assets in the wake of prior economic crises, such as the aftermath of 9/11 and the 2008 collapse of Lehman Brothers, in assessing the potential impact of recent economic events on the Fixed/Floating Debtors.

On August 9, 2011, Cerberus/Chatham convened a conference call with Debtors, Midland and Lehman during which Cerberus/Chatham informed Debtors that they were reevaluating the transaction in light of the current economic climate and analyzing whether a material adverse event had occurred. (Ex. 26 (Marc Beilinson email to William Derrough, dated Aug. 9, 2011.) Beilinson stated that "Cerberus informed us that due to the current economic cli[mate] they are evaluating the transaction and will revert to us when they are ready to pick a

37

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

new closing date. . . .[T]hey said w[e]ll we could always consider whether there is a MAC.").)

During this call, there was no discussion of renegotiating the price of for the Fixed/Floating

Debtors. Later, Debtors and Moelis considered asking Five Mile to extend its Backup Bid for

the Fixed/Floating Debtors. (*Id.*)

        The evidence will also show that on August 11, 2011, Thomas Wagner of

Cerberus had separate telephone calls with Marc Beilinson, the Chief Restructuring Officer of

Innkeepers, and Alex Rubin of Moelis. In those calls, Beilinson and Rubin stated that if

Cerberus declared a material adverse event, the Bankruptcy Court would decide whether the $20

million Deposit would be returned to Cerberus/Chatham. Neither Beilinson nor Rubin claimed

that Debtors were entitled to either compensatory damages or specific performance of the

Commitment Letter.

        The evidence will show as well that during that week, Cerberus concluded that the

recent severe economic downturn could reasonably be expected to have a material adverse effect

on the Fixed/Floating Debtors, taken as a whole. After discussions with the various

constituencies, Cerberus/Chatham terminated the Commitment Letter on August 19, 2011,

pursuant to Section 9 of the Commitment Letter on the grounds that there had been a

"Termination Event" as defined in the sixth bullet under "Termination" in the Term Sheet, which

referenced the MAE Clause. (Ex. 27 (Letter from Cerberus/Chatham terminating the

Commitment Letter and Term Sheet, dated Aug. 19, 2011).) Cerberus/Chatham also provided

notice to Wells Fargo, as Escrow Agent, to release the $20 million Deposit back to

Cerberus/Chatham. (*Id.*)

        On August 29, 2011, Debtors filed the Complaint in this Adversary Proceeding,

seeking a declaration and judgment that the Defendants' termination of the Commitment Letter

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

is a breach of their obligations under the Commitment Letter, Confirmation Order and

underlying Plan of Reorganization, an order requiring Defendants to specifically perform their

obligations, or, in the alternative to specific performance, an order requiring Defendants to pay

substantial damages for breach of the Commitment Letter, Confirmation Order and underlying

Plan of Reorganization, or for equitable estoppel. (Compl. [Doc. No. 2045].)[7]  On August 31,

2011, Debtors filed a Motion to Expedite Proceedings on the Merits.  [Doc. Nos. 2052, 2053.]

At the direction of the Court, the parties negotiated a Scheduling Order, which the Court so-

ordered on September 6, 2011.  [Doc. No. 2067.]  Under the Scheduling Order, the trial on all

claims and defenses is scheduled for October 10-12, 2011.

## ARGUMENT

### I.   DEFENDANTS PROPERLY TERMINATED THE COMMITMENT LETTER

As described herein, after executing the Commitment Letter, a series of

unforeseeable, unprecedented macroeconomic developments occurred that could reasonably be

expected to have a materially adverse effect on the Fixed/Floating Debtors.  Accordingly,

Cerberus/Chatham was entitled to terminate the Commitment Letter pursuant to the MAE Clause

in the Term Sheet.

### A.   By Its Terms, the MAE Clause in the Term Sheet Includes Reasonable Expectations Regarding the "Prospects" of the Fixed/Floating Debtors

Under the Commitment Letter and Term Sheet, Cerberus/Chatham may terminate

the Commitment Letter and Term Sheet by written notice to the Debtors and Midland upon:

> The occurrence of any condition, change or development that
> could reasonably be expected to have a material adverse effect on
> the business, assets, liabilities (actual or contingent), or operations,

---

[7]      On September 27, 2011, Debtors filed an Amended Complaint which amended paragraph 114 of the
Complaint to invoke the Court's equitable authority, including under 11 U.S.C. § 1142(b), to order Defendants to
comply with their obligations under the Fixed/Floating Plan.  (Am. Compl. ¶ 114 [Adv. Proc. Doc. No. 45].)

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

> condition (financial or otherwise) or <u>prospects</u> of the
> Fixed/Floating Debtors taken as a whole; <u>provided</u>, <u>however</u>, that
> this Termination Event shall not apply to the chapter 11 case of
> Grand Prix West Palm Beach LLC . . . .

(Ex. 5 (Term Sheet at 7) (emphasis added).)

The MAE Clause in the Term Sheet is particularly broad and buyer friendly. According to Professor Eric L. Talley, a professor of law at U.C. Berkeley and a Senior Economist from the RAND Corporation who has published numerous articles examining the use of MAE provisions in corporate acquisitions: "As compared to the thousands of MAC/MAE provisions I have analyzed in this research, the Fixed/Floating Debtors MAC/MAE is extremely buyer friendly, allocating substantially more risk and uncertainty on the seller than do typical MAC/MAE provisions." (Talley Report ¶ 30.)

One of the reasons the MAE Clause in the Term Sheet is especially buyer friendly is that it uses the phrase "could reasonably be expected to have" and the term "prospects," which means that a material adverse event can be based on reasonable expectations of the <u>future</u> business, assets, liabilities, operations or conditions of the Fixed/Floating Debtors taken as a whole. The term "prospects" is forward-looking language that "allows much greater latitude for a buyer's termination rights than does a MAC/MAE clause that turns solely on hard, current indicia."[8] (Talley Report ¶ 31.) Moreover, Debtors chose the more indefinite term "could" rather than "would."[9]

---

[8]    To Marc Beilinson, Debtors' Chief Restructuring Officer, the term "prospects" means "mid to long term projections." (Beilinson Dep. 214:9.)

[9]    It is rare for a MAE clause to use such buyer-friendly terms, like "prospects" and "could reasonably be expected to have." In Professor Talley's quantitative analysis of 528 MAC/MAE provisions in acquisition agreements, the term "prospects" appeared in only 3.22% of the deals, the invocation of "reasonable expectations" appeared in only 15.34% of the deals, and use of the combination of (1) an affirmative MAE on business, operations and financial conditions, (2) use of the term "prospects" and (3) the invocation of "reasonable expectations" appeared in only 1% of the deals. (Talley Report ¶ 43.) Moreover, the use of the term "could" which connotes a lesser degree of likelihood than the terms "would" or "will," appeared in only 7.3% of the MAE clauses studied by

40

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

In *Frontier Oil Corp. v. Holly Corp.*, Civ. A No. 20502, 2005 WL 1039027 (Del.

Ch. Apr. 29, 2005), the MAE clause at issue used the phrases "would not reasonably be expected

to have" and the term "prospects." The court stated that those terms "emphasize[] the need for

forward looking analysis." *Id.* at *33. Similarly, in *Nip v. Checkpoint System, Inc.*, 154 S.W.3d

767, 769 (Tex. App. 2004), the MAE clause in question used the same forward-looking terms as

the MAE Clause in the Term Sheet. In *Nip*, the contract in question defined a material adverse

effect as:

> a change (or effect) in the condition (financial or otherwise),
> properties, assets, liabilities, rights, obligations, operations,
> business, or <u>prospects</u> which change (or effect), individually or in
> the aggregate, adversely affects, or <u>could reasonably be expected</u>
> to adversely affect, such condition, properties, assets, liabilities,
> rights, obligations, operations, business, or prospects in an amount
> equal to or greater than $50,000.

*Id.* at 769 (emphasis added). The court in *Nip* found that a reasonable finder of fact could

conclude there "was a material adverse change under the Agreement because such a loss in

<u>future business prospects</u> could reasonably be expected to exceed the amount of $50,000." *Id.* at

770 (emphasis added).

Moreover, in addition to being forward-looking, the MAE Clause in the Term

Sheet does not require a material adverse effect to actually occur. Rather, under the MAE

Clause, the Commitment Letter can be terminated if the occurrence in question "<u>could

reasonably be expected</u> to have" a material adverse effect on the Fixed/Floating Debtors. Also,

as noted earlier, the use of the term "could" connotes a lower probability than the term "would."

*See Frontier Oil Corp.*, 2005 WL 1039027, at *33 n.209 ("The parties used 'would,' not 'could'

or 'might.' 'Would' connotes a greater degree (although quantification is difficult) of likelihood

---

Professor Talley, and the combination of "could" in conjunction with the term "reasonably" appeared in only 5.6%
of the sampled MAC/MAE clauses. (*Id.* ¶ 46.)

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

than 'could' or 'might,' which would have suggested a stronger element of speculation (or a

lesser probability of adverse consequences)."); Talley Report ¶ 32 (the phrase "could reasonably

be expected" in the MAE Clause "represents a low threshold for triggering a MAC/MAE,

requiring a degree of confidence that falls short of that contained in most MAC/MAEs. That this

language modifies (among other things) a trigger on contingencies that affect the seller's

'prospects' lowers this threshold even further."). Indeed, when asked if the phrase "could

reasonably be expected" means that the event in question "need not have had an impact yet,"

Marc Beilinson, Debtors' Chief Restructuring Officer and Rule 30(b)(6) witness, testified: "I

think that's generally true." (Beilinson Dep. 217:6.)

      The MAE Clause also uses a "reasonableness" standard, which by definition is a

broad standard because a fact finder must decide that reasonable people could not differ as to

whether the occurrence in question "could" have a material adverse effect on the Fixed/Floating

Debtors. *See* Robert T. Miller, *Canceling the Deal: Two Models of Material Adverse Change

Clauses in Business Combination Agreements*, 31 Cardozo L. Rev. 99, 112-13 (Sept. 2009) ("To

take the clearest case, whether a proposition <u>could reasonably</u> be believed is clearly very

different from whether that same proposition <u>would reasonably</u> be believed. The former is a

question of whether <u>any</u> reasonable person could believe the proposition, i.e., whether, within the

constraints of reason, it is possible to believe the proposition. The latter is a question of whether

<u>every</u> reasonable person <u>has</u> to believe the proposition, i.e., whether, within the constraints of

reason, it is necessary to believe the proposition." (emphasis added)).

      Here, as discussed above, since May 16, 2011, the date on which

Cerberus/Chatham executed the Commitment Letter, there have been a series of unforeseeable,

unprecedented and materially adverse economic developments, including: (1) U.S. economic

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

conditions deteriorated significantly; (2) reduced U.S. GDP projections; (3) widespread reports

of a possible "double dip" recession; (4) a 30-40% decline in the equity market value of

comparable lodging operators; (5) S&P's downgrade of the United States' credit rating; (6)

downgraded expectations regarding lodging industry prospects; (7) analysts revising their

revenue forecasts for the lodging sector down substantially; (8) expectations about disruptions in

hotel asset sales; and (9) severe tightening in the capital markets.  (Fischel Report ¶¶ 11-17.)

As a result of these adverse macroeconomic forces, U.S. economic conditions

have deteriorated significantly; lodging REIT market values declined substantially as U.S.

economic conditions deteriorated; industry observers downgraded their expectations regarding

lodging industry prospects; analysts revised their revenue forecasts for the lodging sector down

substantially; analysts revised their price targets and recommendations down substantially; hotel

asset sales were expected to be disrupted; and financing became more expensive.  (*Id.*)  Indeed,

as discussed above, a comparison of the decline in lodging REIT market values to the decline in

value of the overall market after May 16, 2011 shows that the value the Fixed/Floating Debtors

was even more adversely affected by the deterioration in U.S. economic conditions than was the

overall U.S. market.  (Fischel Report ¶ 18.)  These unforeseen adverse economic conditions on

both the macroeconomic level and on the lodging industry clearly could reasonably be expected

to have a material adverse effect on the condition, properties, assets, liabilities, rights,

obligations, operations, business, and prospects of the Fixed/Floating Debtors.

In their Complaint, Debtors contend that as of August 29, 2011 (the date of the

Complaint), the Fixed/Floating Debtors' "performance metrics and prospects remain strong"

because the Fixed/Floating Debtors have performed "at, near or above the Debtors' 2011

Budget," and the forecast through the end of 2011 "remained substantially unchanged from the

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

2011 Budget approved in February." (Am. Compl. ¶¶ 67-69 [Adv. Proc. Doc. No. 45].) Even if

those assertions were true, Debtors miss the point. Even if the impact of the current economic

crisis has not yet manifested itself in near-term operating performance of the Fixed/Floating

Debtors, as discussed above, the MAE Clause allows Cerberus/Chatham to terminate the

Commitment Letter if the current economic conditions "could reasonably be expected to have" a

material adverse effect on the "prospects" of the Fixed/Floating Debtors. The MAE Clause does

not require that the current economic conditions already had a material adverse effect.

Moreover, asset values are determined based upon expectations of future

performance, meaning that how the asset is expected to perform in the future (i.e., future cash

flows, etc.) determines its value today. (Fischel Report ¶ 21.) The drastic declines in the current

value of lodging REITs has occurred because their future performance is expected to deteriorate

substantially. (Id.) Thus, the result of the current economic crisis has been a significant

diminution in the current values of the Fixed/Floating Debtors' business, assets, and prospects,

even if there has been no significant immediate decline in performance.[10] (Id.)

---

[10]    Debtors submit the Expert Report of Mark E. Zmijewski, Ph.D ("Zmijewski Report"), which concludes that
Debtors' "financial performance between the Commitment Date [i.e., May 16, 2011] and the Termination Date [i.e.,
August 19, 2011] did not experience an adverse change." (Zmijewski Report ¶ 14.) However, Dr. Zmijewski bases
this opinion on his "examination of the Fixed/Floating Debtors' historical financial performance between the
Commitment Date and the Termination Date based on information available as of the Termination Date."
(Zmijewski Report ¶ 23 (emphasis added).)

        "In order for an expert's testimony to qualify as relevant it must assist the trier of fact to determine any fact
at issue in the case. . . . An irrelevant expert report, like any irrelevant testimony, is not admissible." Giles v.
Rhodes, No. 94 CIV. 6385(CSH), 2000 WL 1425046, at *4 (S.D.N.Y. Sept. 27, 2000); MTX Commc'ns Corp. v.
LDDS/Worldcom, Inc., 132 F. Supp. 2d 289, 293 (S.D.N.Y. 2001) (expert's "omissions are . . . so significant as to
render the valuation irrelevant because it does not 'fit' the facts of this case."). Here, because the Zmijewski Report
relies entirely on "historical" financial performance and whether there has been a material adverse effect "from the
Commitment Date to Termination Date," the Zmijewski Report is not helpful to the trier of fact to determine
whether there has been an "occurrence of any condition, change or development that could reasonably be expected
to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition
(financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole." (Ex. 5 (Term Sheet at 7
(emphasis added)).)

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

### B.   Macroeconomic Occurrences Can Constitute a Material Adverse Event Under the MAE Clause in the Term Sheet

In their Complaint, Debtors contend that a material disruption in the conditions of the financial, banking, capital or hospitality markets cannot constitute a material adverse event because the MAE Clause in the Term Sheet does not include a so-called "market MAE" provision. (Am. Compl. ¶ 30 [Adv. Proc. Doc. No. 45].)  However, the MAE Clause in the Term Sheet provides that a material adverse event can be the occurrence of "<u>any</u> condition, change or development" that reasonably could be expected to have a material adverse effect to the Fixed/Floating Debtors, and the MAE Clause does not contain a carve-out for changes in the overall economy as the causal agent for the impact on the Fixed/Floating Debtors.  (Fischel Report ¶ 35.)

Typically, MAE clauses have a two-part structure.  One part – the "affirmative" section – usually appears at the beginning of the MAE clause and enumerates broad categories of contingencies that trigger the MAE clause, thereby relieving the buyer of its obligation to close. (Tally Report ¶ 23.)  The second part – the "carve-out" section – sets forth specific contingencies that – notwithstanding the broader affirmative provisions – do not constitute a material adverse event.  (*Id.*)  When parties to an acquisition want to allocate economic, market or industry risks to the buyer, "it is standard practice to enumerate such risks as explicit exceptions to the MAC/MAE provision," and "the omission of such exclusions implies that the seller continues to bear these risks and uncertainties."  (*Id.* ¶ 25.)  Thus, "in light of industry practice and the affirmative provisions at issue here, the omission of any reference to market risk implies that the <u>seller</u> (not the buyer) bears such risk."  (*Id.* ¶ 34.)

Courts have made clear that where an MAE Clause does not contain a specific carve-out for changes to market conditions, such changes to market conditions can constitute a

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

material adverse event. As one court stated: "Although many . . . contracts contain specific

exclusions from MAE clauses that cover declines in the overall economy or the relevant industry

sector, or adverse weather or market conditions, [this MAE clause] is unqualified by such

express exclusions." *In re IBP, Inc. S'holders Litig. (IBP, Inc. v. Tyson Foods, Inc.)*, 789 A.2d

14, 65-66 (Del. Ch. 2001) ("*Tyson*"). Therefore, "industry-wide or general factors" can

constitute a material adverse event. *Id.* at 66; *see also Great Lakes Chem. Corp. v. Pharmacia

Corp.*, 788 A.2d 544, 557 (Del. Ch. 2001) ("Had the parties intended to exclude from [the MAE

clause's] scope all external events that materially affect the Company's business, they could have

included such an express limitation in their Agreement. They did not, however.").

     Unlike the MAE Clause in the Term Sheet, many MAE clauses contain a specific

carve out for declines in the overall economy. For example:

- In *Frontier Oil*, "[t]he parties excluded from the scope of the MAE provision those adverse effects that may result from general economic, regulatory, or political conditions or changes, financial market fluctuations, and changes, and changes in the petroleum refining industry generally." *Frontier Oil Corp.*, 2005 WL 1039027, at *33 n.211.

- In *Genesco*, "the carve-out of a material adverse effect under the Merger Agreement, section 3.1(a)(B) excludes from the MAE, general economic conditions such as gas prices, problems in the lending industry." *Genesco, Inc. v. Finish Line, Inc.*, No. 07-2137-II(III), Mem. & Order at 13 (Tenn. Chan. Ct. Dec. 27, 2007).

     Commentators have noted a proliferation of carve-outs in MAE clauses, including

carve-outs for declines in the overall economy:

     Over the years, MAC/MAE clauses have become quite lengthy, with many carve-outs, exceptions and other intricacies meant to add certainty to the applicability of the clause (about 80 percent, according to the M&A Market Trends Subcommittee of the ABA Committee on Negotiated Acquisitions). For example, such clauses may exempt declines in the overall economy; declines in the relevant industry sector (as contrasted with declines that disproportionately impact the target company); [or] adverse . . . economic or general business conditions.

46

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

Herbert F. Kozlov & Jonathon P. Moyer, *Deal Termination Litigation: The 'Material Adverse
Change Clause' and Other Escape Clauses in a Tightening Deal Market*, Reed Smith Bulletin
08-002, at 5 (Jan. 2008). Here, the MAE Clause in the Term Sheet plainly does not carve-out
declines in the overall economy from the definition of a material adverse event.

Indeed, "the Fixed/Floating Debtors MAC/MAE lacks the most significant
substantive carve outs that are routine within standard industry practice." (Talley Report ¶ 33.)
Carve outs relating to economic, market or industry risks "are among the most frequently
included categories in typical MAC/MAEs, and their absence here is noteworthy." (*Id.*) The
only carve-out in this case provides that the MAE Clause "shall not apply to the chapter 11 case
of Grand Prix West Palm Beach LLC." This carve out, which is not at issue, makes clear that
Debtors knew how to add carve-outs to the definition of a material adverse event, but did not
draft a carve-out for general economic or financial market conditions.

Moreover, Debtors and Five Mile/Lehman drafted the MAE Clause in the Term
Sheet, not Cerberus/Chatham. (Beilinson Dep. 213:10-214:2.) To the extent that there is any
ambiguity in the MAE Clause, which there is not, under the doctrine of *contra proferentem* that
ambiguity should be construed against the Debtors. *See Mastrobuono v. Shearson Lehman
Hutton, Inc.*, 514 U.S. 52, 63 (1994) ("Respondents drafted an ambiguous document, and they
cannot now claim the benefit of the doubt. The reason for this rule is to protect the party who
did not choose the language from an unintended or unfair result.").

### C. The Determination of Whether a Material Adverse Event Occurred Must Be Viewed From the Perspective of the Reasonable Acquiror

In determining whether a material adverse event has occurred, the court must
view the impact of the event from the "perspective of a reasonable acquiror." *Tyson*, 789 A.2d at
68. For instance, to a long-term acquiror, "the important thing is whether the company has

47

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

suffered a Material Adverse Effect in its business or results of operations that is consequential to

the company's earnings power over a commercially reasonable period, which one would think

would be measured in years rather than months" but "[t]o a short-term speculator, the failure of a

company to meet analysts' projected earnings for a quarter could be highly material" *Id.* at 67-

68.

In addition, the MAE clause "must be read in the context in which the parties

were transacting." *Id.* at 67 (emphasis added); *see also Frontier Oil Corp.*, 2005 WL 1039027,

at *34 ("The notion of an MAE is imprecise and varies both with the context of the transaction

and its parties and with the words chosen by the parties."); *Genesco, Inc.*, Mem. & Order at 34

("[I]n deciding whether a business change is significant, a court must not do in a vacuum but

with reference to the context and circumstances of the merger.").[11]

Here, Cerberus/Chatham acted as a "reasonable acquirer" under the

circumstances. The evidence will show that Cerberus/Chatham's investment strategy for the

Fixed/Floating Debtors as a financial buyer was to accomplish the return of a portion of the

original equity commitment early and to sell the Fixed/Floating Debtors' hotels within four or

five years. This investment thesis – including the ability to promptly return equity capital from

sales and financings – enabled Cerberus to increase the amount of its bid for the Fixed/Floating

Debtors. The substantial diminution in value of the Fixed/Floating Debtors, which would have

significantly impacted <u>any</u> buyer, also clearly affected Cerberus' particular plans. (Fischel

Report ¶ 31.)

* * *

---

[11]     Although the court in *Genesco* found that a material adverse event had occurred, it ultimately held that the
MAE clause did not apply because (unlike the MAE Clause in the Cerberus/Chatham Term Sheet) the MAE clause
in *Genesco* had a carve out that "excludes from the MAE, general economic conditions such as gas prices [and]
problems in the lending industry" and "Genesco fits within" that carve-out. *Id.* at 33.

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

In sum, the recent unforeseen and unprecedented macroeconomic developments

described above have had a material adverse effect on both the condition, properties, assets,

liabilities, rights, obligations, operations, business, or prospects of the Fixed/Floating Debtors

taken as a whole and on the value of the Fixed/Floating Debtors from the perspective of a

reasonable financial acquiror.  Accordingly, pursuant to the MAE Clause in the Term Sheet, a

"Termination Event" has occurred, entitling Cerberus/Chatham to terminate the Commitment

Letter.[12]

## II.    IF A MATERIAL ADVERSE EVENT DID NOT OCCUR, THE DEBTORS' SOLE REMEDY AT LAW OR IN EQUITY IS TO RETAIN THE DEPOSIT AS LIQUIDATED DAMAGES

### A.    The Liquidated Damages Clause Applies Because the Bidding Procedures Order Is a Judicial Order that Is Binding on the Parties

The Bidding Procedures – which provide that retention of the Deposit is the

Debtors' "sole and exclusive remedy at law and in equity" – were approved by Court order and

are binding on the parties.  In *Galleria Investments LLC v. Hong Duck LLC (In re Galleria Invs.*

*LLC)*, No. A06–62557–PWB, 2008 WL 7842107 (Bankr. N.D. Ga. Apr. 4, 2008), the

Bankruptcy Court approved auction and sale procedures that were virtually identical to those

followed in this case, which the court described as follows:

> The bidding procedures order provided for the sale of the property
> to the successful bidder at the auction, subject to the Court's final
> approval, pursuant to a contract with the same material terms and
> conditions (with an appropriate adjustment to the purchase price)
> as the contract that Hong Duck had executed in which it agreed to
> purchase the property.  The contract terms included a provision for
> the Debtor to retain, as liquidated damages, the $1,000,000 earnest

---

[12]    Debtors submit an expert report by John B. Corgel, Ph.D, who opines that recent macroeconomic events have not had a material adverse effect on the future prospects of the Fixed/Floating Debtors.  As of this writing, Cerberus/Chatham has not yet had the opportunity to take Mr. Corgel's deposition, but – as will be demonstrated at trial – his analysis contains numerous flaws.  It provides no basis to find that it was unreasonable for Cerberus/Chatham to conclude that an MAE had occurred.

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

> money deposit that Hong Duck made if it failed to close in
> accordance with the contract.

*Id.* at \*1.  After the auction, the successful bidder refused to close and attempted to avoid

application of the liquidated damages provision in the Bidding Procedures Order.  In discussing

the binding effect of a Bankruptcy Court's Bidding Procedures Order, the court stated that "an

order approving bidding procedures is binding on the parties in the case and on anyone who

elects to participate in the sale process . . . ."  *Id.* at \*9.  The court explained that the Bidding

Procedures Order gives all parties involved advanced notice of the terms and conditions of the

sale:

> Everyone in the case knows that the proposed procedures, the
> terms and conditions of the sale, and the sale itself in accordance
> with those procedures have received judicial approval and that the
> transaction can take place as authorized.  Similarly, prospective
> purchasers know what they have to do and what is expected of
> them.

*Id.* at \*8.  The court also emphatically stated that the liquidated damages provision in the Bidding

Procedures was not rendered unenforceable by the parties:

> Retention of the earnest money [deposit] as liquidated damages
> was <u>a material part of the transaction that the Court approved</u> at the
> beginning and at the end of the process.  Neither the parties in this
> bankruptcy case nor the Court expected that this material provision
> would be subject to challenge . . . , and <u>the judicial approval of the
> term precludes the assertion that another provision of the contract
> renders it unenforceable.</u>

*Id.* at \*10 (emphasis added).

On January 14, 2011, the Debtors in this case filed a motion "for entry of an order

. . . approving the bidding procedures."  (Bidding Procedures Motion at 2 (emphasis added)

[Doc. No. 820].)  On March 11, 2011, the Court entered the Bidding Procedures Order, which

"ORDERED THAT" the Bidding Procedures – which are attached as Exhibit 2 to the Bidding

Procedures Order – were approved.  Accordingly, the Bidding Procedures are part of a binding

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

court order. Indeed, in this Court's Decision granting Debtors' Bidding Procedures Motion, the

Court stated:

> Sophisticated investors and bankers who identify an asset that they
> believe is undervalued by the marketplace will not be shy about
> joining the fray here. Strategic and financial buyers who want
> these valuable hotel properties will step forward if they have not
> done so already. . . . For now, the time has come to <u>give the market
> and the Debtors the certainty and the 'rules' that they need to
> complete the auction process</u> and move on to plan confirmation.

[Doc. No. 1077 at 25 (emphasis added).]

Since entry of the Bidding Procedures Order, Debtors have repeatedly

acknowledged the binding nature of the Bidding Procedures Order. For instance, throughout the

Fixed/Floating Auction, counsel for Debtors repeatedly made clear that the auction was being

conducted subject to and in accordance with the Bidding Procedures. Indeed, counsel for the

Debtors stated on the record that "[t]he debtors are administering today's auction with respect to

the fixed and floating hotels pursuant to those [bid] procedures." (Ex. 34 (Auction Tr. at 13); *see
also, e.g., id.* at 14 ("As the Bid Procedures set forth, by submitting a bid you are confirming that

you will be abiding by the Bid Procedures that have been approved by the Court[.]"). And, upon

submission of Cerberus/Chatham's initial bid at the auction, counsel for Cerberus, at the request

of Debtors' counsel, confirmed on the record that the bid was submitted in accordance with the

Bidding Procedures. *Id.* at 19.[13]

Moreover, the Confirmation Order, which confirms the Commitment Letter,

states: "This Confirmation Order, the Plan, the Commitment Letter, <u>and all other documents

related thereto</u>, reflecting the terms of the Fixed/Floating Successful Bid, <u>shall be binding in all

---

[13]     Moreover, the Debtors recognized that the Bidding Procedures Order is binding upon them when they
returned the Five Mile/Lehman deposit, which had been held by the Debtors until the Five Mile/Lehman Backup
Bid terminated in early August. There is no provision in the Five Mile/Lehman Commitment Letter mandating that
result. Rather, it was required by the Bidding Procedures Order.

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

respects upon . . . the Cerberus/Chatham Fixed/Floating Plan Sponsors, New HoldCo . . . [and]

the Fixed/Floating Debtors." (Confirmation Order ¶ 140 (emphasis added) [Doc. No. 1804].)

The Bidding Procedures Order is plainly "related" to the Commitment Letter (indeed, it is

explicitly referenced in Section 6 therein) and therefore is "binding in all respects" upon the

Debtors.

   In light of the foregoing, even if there was no material adverse event, Debtors

only remedy is retention of the $20 million Deposit because of the binding nature of the Bidding

Procedures Order.

### B. The Bidding Procedures Order Is Incorporated by Reference in Section 6 of the Commitment Letter In Clear and Unambiguous Terms

   The Bidding Procedures Order also applies by virtue of having been incorporated

by reference in Section 6 of the Commitment Letter. Under New York law, which governs the

Commitment Letter, where a contract is clear on its face, "interpretation of the contract is a

question of law and no trial is necessary to determine the legal effect of the contract." *Bethlehem*

*Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957) (citations omitted); *see also*

*Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 960 (N.Y. 2001) ("'when parties set down

their agreement in a clear, complete document, their writing should as a rule be enforced

according to its terms'") (quoting *W.W.W. Assocs., Inc. v. Giancoteri*, 566 N.E.2d 639, 642

(N.Y. 1990)).

   Where, as here, a contract is clear, courts "are required to adjudicate [the parties']

rights according to the unambiguous terms of the contract and therefore must give the words and

phrases employed their plain meaning." *Laba v. Carey*, 277 N.E.2d 641, 644-45 (N.Y. 1971);

*accord R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002); *Red Ball Interior*

*Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999). The parties' intent is

52

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

relevant only "to the extent that they evidenced what they intended by what they wrote." *Laba*,

277 N.E.2d at 644 (citations omitted); *accord Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 947

(5th Cir. 1981) (same). This is consistent with the principle of New York law that "a contract is

to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal

language employed." *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)).

When a contract is unambiguous, "[e]vidence outside the four corners of the

document as to what was really intended but unstated or misstated is generally inadmissible to

add to or vary the writing." *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings,*

*Inc.*, No. 08-0102, 2008 WL 3925272, at *8 (N.D. Tex. Aug. 27, 2008) (quoting *W.W.W.*

*Assocs.*, 566 N.E.2d at 642), *aff'd*, 377 F. App'x 422 (5th Cir. 2010). A court may not "redraft a

contract to accord with its instinct for the dispensation of equity upon the facts of a given case."

*Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citations omitted; applying New

York law); *accord Broad*, 642 F.2d at 947 (same; applying New York law); *U.S. Trust Co. of*

*N.Y. v. Alpert*, 10 F. Supp. 2d 290, 299 (S.D.N.Y. 1998) (same), *aff'd sub nom. U.S. Trust Co. of*

*N.Y. v. Jenner*, 168 F.3d 630 (2d Cir. 1999); *Breed*, 385 N.E.2d at 1283 ("a court may not make

or vary [a] contract to accomplish its notions of abstract justice or moral obligation"). The

foregoing is particularly so where, as here, the parties are "sophisticated businessmen" who

"reduced their negotiations to a clear, complete writing." *W.W.W. Assocs.*, 566 N.E.2d at 642

(enforcing unambiguous contract terms).

Under the doctrine of incorporation by reference, "a paper referred to in a written

instrument and sufficiently described may be made a part of the instrument as if incorporated

into the body of it." *Creative Waste Mgmt., Inc. v. Capital Envtl. Servs., Inc.*, 429 F. Supp. 2d

582, 602 (S.D.N.Y. 2006) (internal quotation marks and citations omitted). "The papers to be

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

incorporated by reference into the document must be so referred to and described in the

instrument that the paper may be identified beyond all reasonable doubt." *Id.*

Here, Section 6 of the Commitment Letter, in clear and unambiguous language,

provides: "In accordance with the Bidding Procedures Order, the Plan Sponsors have deposited

cash in an amount equal to $20 million (the 'Deposit') to [the Escrow Agent]." (Ex. 5

(Commitment Letter § 6) (emphasis added).) The Bidding Procedures Order is clearly

"identified beyond all reasonable doubt" in Section 6 and therefore incorporated by reference.

Attached as Exhibit 2 to the Bidding Procedures Order are the Bidding Procedures. Section 8 of

the Bidding Procedures sets forth the terms and conditions governing the making of, and

disposition of, the Deposit under various circumstances. In particular, Section 8 provides: (1) in

the event that a bid is not a "Qualified Bid," Debtors are required to return the Deposit within

five business days after the Bid Deadline; (2) in the event that a bidder at the Fixed/Floating

Auction is not the Successful Bidder or Backup Bidder, Debtors are required to return the

Deposit within five business days after the Fixed/Floating Auction; (3) if the Successful Bidder

(or Backup Bidder, if applicable) timely closes the contemplated transactions, the Deposit is

credited towards its equity commitment; and (4) in the event that the Successful Bidder (or the

Backup Bidder, if applicable) fails to close:

> the Debtors will not have any obligation to return the Deposit
> deposited by such Successful Bidder (or the Backup Bidder, if
> applicable). Retention of the Deposit, plus accrued interest, as
> liquidated damages, shall be the Fixed/Floating Debtors' sole
> remedy at law and in equity against the Successful Bidder (or the
> Backup Bidder, if applicable) . . . .

(Bidding Procedures § 8 (emphasis added).)

By unequivocally stating that the Deposit had been made "in accordance with the

Bidding Procedures Order," Section 6 of the Commitment Letter, in clear and unambiguous

54

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

terms, identified the Bidding Procedures Order "beyond all reasonable doubt," thereby

incorporating by reference the Liquidated Damages Clause in Section 8 of the Bidding

Procedures.[14] The plain language of Section 6 clearly governs, and Debtors cannot ignore it by

claiming that Cerberus/Chatham's election not to use the Five Mile/Lehman form of liquidated

damages clause had some hidden, undisclosed meaning.

> **C.     The Reference to the Bidding Procedures Order in Section 6 of the
> Commitment Letter Must Be Given Effect**

It is hornbook law that "[a]n interpretation which gives effect to all provisions of

the contract is preferred to one which renders a portion of the writing superfluous, useless or

inexplicable. A court will interpret a contract in a manner that gives reasonable meaning to all of

its provisions, if possible." 11 Williston on Contracts § 32:5 (4th ed.). Courts disfavor contract

interpretations that would render a provision superfluous. *Scholastic, Inc. v. Harris*, 259 F.3d

73, 83 (2d Cir. 2001); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine

Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)) ("Under New York law an interpretation of a

contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not

preferred and will be avoided if possible.'"). Accordingly, "courts may not by construction . . .

excise terms, nor distort the meaning of those used and thereby make a new contract for the

---

[14]     There are numerous cases in which liquidated damages clauses have been held to be incorporated by reference into a contract. For instance, in *National Fire Insurance Co. of Hartford v. Fortune Construction Co.*, 320 F.3d 1260 (11th Cir. 2003), National Fire, as surety, issued on behalf of Arkin, as principal, certain bonds for two construction projects. Each of the bonds incorporated by reference certain subcontracts between Arkin and Fortune, each of which contained a liquidated damages clause for delays in completing the projects. After delays occurred, National Fire denied any responsibility for liquidated damages, arguing that the bonds did not expressly recognize liquidated damages for delays. *Id.* at 1274. The court rejected that argument, finding that "the bonds at issue in this case expressly incorporated the subcontracts, which, in turn, do expressly provide for liquidated delay damages." *Id.* at 1275. "Where a provision for liquidated delay damages is clearly delineated in the underlying contract and incorporated by reference into the [subsequent contract], the [party] is on notice of . . . the contractual consequences of failure to timely perform in accordance with the contract." *Id.*; *see also LaBarbera v. Hardin Contracting Inc.*, No. 07-CV-5063 (ENV)(SMG), 2010 WL 148084, at *3 (E.D.N.Y. Jan. 13, 2010) (plaintiffs awarded liquidated damages for breach of a collective bargaining agreement, which incorporated by reference a Trust Agreement that contained a liquidated damages clause); *Bourgal v. Lakewood Haulage Inc.*, 827 F. Supp. 126, 127 (E.D.N.Y. 1993) (defendant ordered to pay liquidated damages pursuant to a Declaration of Trust that contained a liquidated damages clause that was incorporated by reference in collective bargaining agreement).

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

parties under the guise of interpreting the writing." *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (citations omitted).

Here, Debtors – in seeking to compel specific performance – attempt to read out of the Commitment Letter the clear and unambiguous provision that Cerberus/Chatham made the $20 million Deposit "[i]n accordance with the Bidding Procedures Order." Debtors' interpretation of Section 6 of the Commitment Letter would render at least two provisions of the Commitment Letter superfluous. First, under Section 6, the phrase "[i]n accordance with the Bidding Procedures Order" would be given no meaning. Second, Section 16 of the Commitment Letter provides that in the event that the Commitment Letter is terminated, "the following agreements and obligations of the parties shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof: . . . [Section] 6 (Deposit) . . . ." If, as Debtors contend, the provisions of Section 8 of the Bidding Procedures (including the Liquidated Damages Clause) are not incorporated by reference into the Commitment Letter, Section 16, which provides that that Section 6 (the Deposit provision) survives termination of the Commitment Letter, would have no meaning.

Moreover, if the Bidding Procedures Order is not incorporated by reference into the Commitment Letter, there would be no terms that govern how or when the Deposit gets applied or returned because, aside from the reference to the Bidding Procedures Order, the Commitment Letter contains no other discussion of the Deposit or the treatment or application of the Deposit under varying circumstances. In particular, neither the Commitment Letter nor the Term Sheet, nor any of the Exhibits or Appendices thereto, contain any provision addressing:

- the type of account in which the Deposit would be held, such as an escrow or other type of account;

- who would own the account;

56

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

- whether interest would be earned on the Deposit;

- in whose name the account would be held;

- whether the Deposit would be subject to the liens or claims of any creditors of the Debtors;

- whether the Deposit would be considered property of the Debtors' estates;

- what would happen to the Deposit in the event that Cerberus/Chatham's bid was not deemed to be a Qualified Bid;

- what would happen to the Deposit in the event that Cerberus/Chatham was not declared the Successful Bidder or the Backup Bidder;

- whether the Deposit would be credited towards Cerberus/Chatham's equity commitment at closing if Cerberus/Chatham were declared to be the Successful Bidder (or the Backup Bidder, if applicable);

- what would happen to the Deposit in the event Cerberus/Chatham, if declared to be the Successful Bidder (or the Backup Bidder) failed to consummate the restructuring transactions contemplated in the Successful Bid (or the Backup Bid, if applicable) because of a breach or failure to perform; or

- whether retention of the Deposit, as liquidated damages, would serve as the Fixed/Floating Debtors' sole remedy in law or in equity in the event Cerberus/Chatham, if declared the Successful Bidder or Backup Bidder, breached or failed to perform.

The treatment of the Deposit in each of these circumstances <u>is</u> specifically addressed only in the Bidding Procedures.[15] Section 6 of the Commitment Letter, however, fills that gap by clearly and unambiguously incorporating the Bidding Procedures Order by

---

[15]     It is noteworthy that the only term addressing the disposition of the Deposit in the entire Commitment Letter and Term Sheet, other than Section 6, is at the end of the Termination Events section of the Term Sheet. That provision states:

> Upon termination of the Amended and Restated Commitment Letter and Amended and Restated Term Sheet as a result of a Termination Event, the Deposit (as defined in the Bidding Procedures Order) shall be returned to the Plan Sponsors with any interest accrued thereon in accordance with the terms of the escrow agreement among the Company, New HoldCo and the escrow agent with respect to such Deposit.

(Ex. 5 (Term Sheet at 8).) This is the only circumstance relating to the disposition of the Deposit for which reference to the Bidding Procedures is not required.

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

reference.[16] *See In re Clark Retail Enters., Inc.*, 308 B.R. 869, 890, 892 (Bankr. N.D. Ill. 2004) (under agreement to buy debtor's assets from bankruptcy auction, liquidated damages clause "must be read within the context of both the entire document and the Bidding Procedures. . . . Entitling [debtor] to money over and above the initial deposits actually paid by [the Successful Bidder] in earnest would both be illogical and lead to an unreasonable result from any bona fide purchaser's perspective.").

In sum, the reference to the Bidding Procedures Order in Section 6 of the Commitment Letter must be given effect.

### D.    The Liquidated Damages Clause under the Bidding Procedures Order Bars Specific Performance as a Matter of Law

Debtors are not entitled to specific performance because the Bidding Procedures Order provides that liquidated damages "shall be the Fixed/Floating Debtors' sole remedy at law and in equity." By contrast, there is no provision in the Commitment Letter, Term Sheet, Bidding Procedures Order, Confirmation Order or any other document related to this transaction that gives Debtors the right to specific performance.

"It has long been the rule in New York that as long as the parties provide in their contract that the agreed upon, specified damage remedy is their sole and exclusive remedy, they will be held to have agreed, by the terms of their contract, to have precluded the remedy of specific performance." *In re Delphi Corp.*, Adv. Nos. 08-01232-RDD, 08-01233-RDD, 2008

---

[16]    Indeed, during the deposition of Marc Beilinson, Debtors' Chief Restructuring Officer and Rule 30(b)(6) witness, Mr. Beilinson acknowledged that Section 6 of the Commitment Letter does not specify whether the Deposit must be put into an interest-bearing account, who would get credit for that interest, whether the Deposit would be subject to liens or claims of any creditors of Debtors, what would happen to the Deposit if Cerberus/Chatham were not declared the Successful Bidder or Backup Bidder, or whether the Deposit would be credited to Cerberus/Chatham's equity commitment at closing. (Beilinson Dep. 91:6-94:15.) When asked where he would look to determine how the Deposit would be applied in those circumstances, Mr. Beilinson testified: "I'd look in the term sheet. I'd look at all the documents that were, you know, incorporated." (Beilinson Dep. 94:16-19 (emphasis added).) When asked if he would look to the Bidding Procedures to determine how the Deposit was applied in those circumstances, Mr. Beilinson testified: "At this point, I would look to the bidding procedures, too." (Beilinson Dep. 96:5-8.)

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

WL 3486615, at *12 (Bankr. S.D.N.Y. Aug. 11, 2008) (emphasis added). "For there to be a

complete bar to [specific performance] there must be . . . explicit language in the contract that <u>the</u>

<u>liquidated damages provision was to be the sole remedy.</u>" *Rubinstein v. Rubinstein*, 244 N.E.2d

49, 52  (N.Y. 1968) (emphasis added); *see also Papa Gino's of Am., Inc. v. Plaza at Latham*

*Assocs.*, 135 A.D.2d 74, 76 (3d Dep't 1988) ("[A] liquidated damages clause does not bar the

equitable relief of specific performance unless there is explicit language that it is to be <u>the sole</u>

<u>remedy for a breach.</u>" (emphasis added)).

In *Deutsche Lufthansa AG v. Boeing Co.*, a contract between Boeing and

Lufthansa explicitly limited the parties' remedies by providing that "the above obligations shall

be the sole and exclusive remedy for any default condition." No. 06 CV 7667(LBS), 2006 WL

3155273, at *4 (S.D.N.Y. Oct. 30, 2006).  In determining whether Lufthansa was entitled to

specific performance, the court stated:  "Contracting parties in New York are free to agree that

specific performance is unavailable as a remedy as a matter of law, so long as they specify in

their contract that the agreed upon specified damage remedy is the sole and exclusive remedy."

*Id.*  The court found that "Lufthansa and Boeing used the precise terminology favored by the

courts of New York, 'sole and exclusive remedy,' to limit the remedies available to the non-

defaulting party and to limit the amount each could recover should there be a default." *Id.* at *5.

"A court will not find ambiguity where the interpretation urged by one party would strain the

contract language beyond its reasonable and ordinary meaning, which, in this case, does not

allow for specific performance to be ordered by the Court." *Id.* (internal quotation marks

omitted). *See also In re Delphi Corp.*, 2008 WL 3486615, at *12 ("[T]he parties clearly intended

to preclude specific performance of the agreement and to limit themselves to enforcing a

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

monetary damage claim for breach which, as stated in the [liquidated damages clause] would not,

for breaches of the agreement, exceed the stated Cap.").

Here, the Liquidated Damages Clause in the Bidding Procedures could not be

more clear that liquidated damages is Debtors "sole remedy at law and in equity." Accordingly,

in the event that the Court finds that a material adverse event has not occurred, Debtors "sole

remedy at law and in equity" is the retention of Cerberus/Chatham's $20 million Deposit.

### E.    The Liquidated Damages Clause Was Not "Deleted" From the Commitment Letter

In their Complaint, Debtors allege that "the liquidated damages provision from

the Five Mile/Lehman March Amended Commitment Letter and Term Sheet was deleted" from

the Cerberus/Chatham Commitment Letter. (Am. Compl. ¶ 31 [Adv. Proc. Doc. No. 45].)

However, because the Commitment Letter is clear and unambiguous, reference to

any difference between the Five Mile/Lehman Commitment Letter and the Cerberus/Chatham

Commitment Letter is inadmissible parol evidence. *Highland Crusader Offshore Partners, L.P.

v. LifeCare Holdings, Inc.*, No. 08-0102, 2008 WL 3925272, at *8 (N.D. Tex. Aug. 27, 2008)

(quoting *W.W.W. Assocs.*, 566 N.E.2d at 642) (when a contract is unambiguous, "[e]vidence

outside the four corners of the document as to what was really intended but unstated or misstated

is generally inadmissible to add to or vary the writing").

Even if parol evidence of the difference between the Five Mile/Lehman

Commitment Letter and the Cerberus/Chatham Commit Letter were admissible, the facts show

that the liquidated damages provision was not "deleted" from the Cerberus/Chatham Commit

Letter. Rather, the entire Deposit provision was replaced with an explicit reference to the

Bidding Procedures Order, which contains a substantively identical liquidated damages

provision.

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

The Five Mile/Lehman Commitment Letter was executed on March 9, 2011,

which was <u>before</u> the Bidding Procedures Order was entered on March 11, 2011. Thus, at the

time the Five Mile/Lehman Commitment Letter was executed, there was no court order in place

to be referenced that set forth the terms and conditions of the $20 million Deposit requirement,

the disposition of the Deposit under varying circumstances, or the remedies available to Debtors

if a Successful Bidder breached its agreement to purchase the Fixed/Floating Debtors.

Section 7 of the Five Mile/Lehman Commitment Letter, entitled "Deposit," set

forth the agreement reached by Debtors and Five Mile/Lehman with regard to Five

Mile/Lehman's $20 million Deposit and provided that forfeiture of that the Deposit as liquidated

damages would be Debtors' sole remedy in the event that Five Mile/Lehman breached its

agreement to purchase the Fixed/Floating Debtors. (Ex. 5 (Commitment Letter § 7).) Notably,

Section 7 of the Five Mile/Lehman Commitment Letter contains numerous terms regarding Five

Mile/Lehman's $20 million Deposit that are unique to Five Mile and Lehman, and thus not

relevant to any other bidder. All of the salient terms applicable to all bidders were included in

Section 8 of the Bidding Procedures. In particular, the following italicized portions of Section 7

of the Five Mile/Lehman Commitment Letter are unique to Five Mile/Lehman and have virtually

no applicability to Cerberus/Chatham or any other entity that could have bid on the

Fixed/Floating Debtors:

> [Five Mile/Lehman] shall deposit or cause to be deposited at their
> respective option, (i) cash *and/or (ii) to the extent such loans have
> been funded to the Company, a pledge from Five Mile or Lehman
> of the first portion of any recovery on account of their claims
> under the Five Mile DIP (as defined in the Term Sheet) and the
> Solar DIP (as defined in the Term Sheet), respectively
> (collectively, the 'DIP Loans'), against the respective Borrowers
> (as defined in the respective DIP Loans)*, in an aggregate amount
> equal to, or having value of, $20.0 million . . . . *The responsibility
> for making the deposit shall be allocated among [Five Mile and*

61

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

> *Lehman] as follows: Five Mile - 50% and Lehman - 50%.* The
> escrow agreement shall specify that (i) on the Effective Date (as
> defined in the Term Sheet), the full amount of the cash deposit
> (with interest) deposited *(a) by Lehman shall be paid to Lehman
> and (b) by Five Mile* shall be credited against Five Mile's equity
> commitments, *and the pledge of any claims under the DIP Loans
> shall be released and revoked with respect to such pledging Plan
> Sponsor*, and (ii) upon the occurrence of a termination of this
> Commitment Letter other than due to a Plan Sponsor Breach (as
> defined below), or in the event that any of the terms and conditions
> in the Commitment Letter (including the Term Sheet) are not
> satisfied timely . . . *or the Break-Up Fee and Expense
> Reimbursement become payable to the Plan Sponsors*, the full
> amount of the deposit, plus accrued interest, shall be paid or
> returned, as applicable, to *[Five Mile and Lehman]* and any pledge
> *of a Plan Sponsor's claims under the DIP Loans shall be released
> and revoked.*

(*Id.*)

Section 7 of the Five Mile/Lehman Commitment Letter is plainly unique to Five

Mile/Lehman because, among other reasons, (1) Five Mile and Lehman are creditors of

Innkeepers pursuant to certain "DIP Loans" and had the option of using what they were owed

under those loans to fund their $20 million Deposit, (2) Five Mile and Lehman agreed to fund the

deposit 50/50, and (3) if the transaction closed, Five Mile's portion of the Deposit could be

applied against Five Mile's equity commitments, while Lehman's portion would be returned to

Lehman.[17]   When Cerberus/Chatham drafted its Commitment Letter (based on the Five

Mile/Lehman Commitment Letter) it made no sense for Cerberus/Chatham to use the Deposit

---

[17]    Marc Beilinson, Debtors' Chief Restructuring Officer and Rule 30(b)(6) witness, testified at his deposition
as follows:

> Q: Okay.  Now am I correct that there were aspects of the Five Mile deposit
> provision that were unique to Five Mile because of the deal that Five Mile had
> negotiating -- had negotiated with the company as its stalking horse bid?
>
> . . . .
>
> A: Yes, there were some unique [aspects] because of the DIP financiers in this
> case.  Lehman had a DIP and Five Mile had a DIP.

(Beilinson Dep. 69:5-21.)

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

provisions that are contained in Section 7 of the Five Mile/Lehman Commitment Letter because

they are specific to Five Mile/Lehman. Rather, because the Bidding Procedures Order had

already been entered and specifically set forth the disposition and application of the Deposit

under all possible circumstances, Cerberus/Chatham simply incorporated by reference the

Bidding Procedures Order, including the Liquidated Damages Clause in Section 8 of the Bidding

Procedures.

F.    **Debtors Never Mentioned Any Purported Waiver of Liquidated Damages by Cerberus/Chatham Until Filing This Adversary Proceeding**

Despite the fact that Cerberus/Chatham's purported "deletion" or waiver of

liquidated damages would have been a highly-touted, material and beneficial term favoring

Debtors and significantly distinguishing Cerberus/Chatham's bid from the Five Mile/Lehman

bid, Debtors <u>never</u> mentioned any purported waiver of liquidated damages in their comparative

bid analyses, at the Fixed/Floating Auction, in their communications with Cerberus/Chatham,

Five Mile, Lehman, Midland, the Creditors Committee or the Board of Trustees, or in the

Disclosure Statement, at any hearings, or in the press. (*See, e.g.*, Exs. 10, 11, 17, 22-24;

Disclosure Statement at 3 [Doc. No. 1444]; June 23, 2011 Confirmation Hearing Transcript

[Doc. No. 1854]; Beilinson Dep. 144:17-145:8, 146:13-147:6, 153:23-154:5, 249:18-250:14;

Derrough Dep. 38:15-39:39, 41:17-24.) Nor did Cerberus/Chatham ever state that it was

waiving the Liquidated Damages Clause in the Bidding Procedures.

Under New York law, "waiver should not be lightly presumed and must be based

on a clear manifestation of intent to relinquish a contractual protection." *See Fundamental*

*Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006)

(internal quotation marks omitted). "Indeed, the intent to waive a right must be unmistakably

manifested, and is not to be inferred from a doubtful or equivocal act." *Navillus Tile, Inc. v.*

63

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

*Turner Constr. Co.*, 2 A.D.3d 209, 211 (1st Dep't 2003) (internal quotation marks omitted).

Accordingly, "the intent to waive must be clearly established and cannot be inferred from

doubtful or equivocal acts or language, and the burden of proof is on the person claiming the

waiver of the right." *200 East 87th Street Assocs. v. MTS, Inc.*, 793 F. Supp. 1237, 1251

(S.D.N.Y. 1992) (internal quotation marks omitted).

        Here, the presence of a liquidated damages provision was a material term in the

Five Mile/Lehman Stalking Horse Bid. (Manzo Report at 4.)  Given the materiality of the

liquidated damages provision, in accordance with custom and practice, as well as the fiduciary

obligations of the Debtors' professionals, any omission of the liquidated damages provision

would have been presented in a comparative bid analysis and highlighted to the Debtors' board

of directors, management and other competitive bidders as part of the professional's analysis of

the highest and best bids.  (*Id.*)  Tellingly, the comparative bid analyses done by Debtors and

Moelis comparing Five Mile/Lehman's bid with Cerberus/Chatham's bid make no mention of

any difference in or purported waiver of the liquidated damages provision.  (*See* Exs. 23, 24, 25.)

Moreover, Debtors never mentioned any such difference regarding liquidated damages to

Cerberus/Chatham, Five Mile, Lehman or Midland.  (*Id.*; Beilinson Dep. 144:17-145:8, 146:13-

147:6, 153:23-154:5, 249:18-250:14; Derrough Dep. 38:15-39:39, 41:17-24.)

        Moreover, Debtors certainly did not negotiate with Cerberus/Chatham to waive

liquidated damages, because Debtors intended to keep the bids uniform except as to price.  This

intention to compare "apples to apples" is reflected in the Bid Procedures, which required

competing bidders to submit a marked copy of their bid against the Five Mile/Lehman

Commitment Letter.  Indeed, throughout Cerberus/Chatham's negotiations, Debtors and Midland

were resistant to the requests of Cerberus/Chatham to change certain terms and conditions set

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

forth in the Five Mile/Lehman Amended Commitment Letter and related Term Sheet. (*See, e.g.*,

Ex. 20 (Email from Brian Lennon to Stuart Freedman, et al., dated Apr. 29, 2011.)  Debtors

admit that they never discussed with Cerberus/Chatham liquidated damages, specific

performance or any other relief to which Debtors would be entitled if Cerberus/Chatham

breached the Commitment Letter.  (Beilinson Dep. 249:18-250:14.)

       Given that the Liquidated Damages Clause in the Bidding Procedures is clearly

"buyer friendly," any waiver or relinquishment of that provision would have been material to the

Debtors.  (Manzo Report at 21.)  If Debtors had believed that the bids submitted by

Cerberus/Chatham had waived or otherwise eliminated the Liquidated Damages Clause, it would

have been a material distinction between the bids causing the Debtors to (a) announce it on the

record at the Fixed/Floating Auction, (b) discount the Five Mile/Lehman bids to account for such

a material difference, and (c) disclose it to the Court in the disclosure statement and other

instances where the Commitment Letter was described.[18]  (Manzo Report at 23.)  Debtors'

failure to ever announce, disclose or discuss any purported waiver by Cerberus/Chatham of the

Liquidated Damages Clause in the Bidding Procedures reflects that there was no such waiver.

**G.**      **The Integration Clause in the Commitment Letter Does Not Bar the
Applicability of the Liquidated Damages Clause in the Bidding Procedures**

       During a scheduling conference held before the Court on August 31, 2011,

Debtors' counsel argued that the Commitment Letter supersedes the Liquidated Damages Clause

in the Bidding Procedures Order by operation of the Integration Clause in Section 15 of the

Commitment Letter.  (Aug. 31, 2011 Hearing Tr. at 15.)  However, by its clear and unambiguous

---

[18]      When asked if Five Mile/Lehman and Cerberus/Chatham made their bids at the Fixed/Floating Auction in
accordance with the Bidding Procedures, William Derrough, Debtors' investment banker, testified: "I mean, it was
a pretty simple, you know, bidding process.  It was basically, you know, dollar increments."  (Derrough Dep. 190:4-
6.)

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

terms, the Integration Clause does not apply to the Bidding Procedures Order. The Integration

Clause provides:

> This Amended and Restated Commitment Letter and the Amended
> and Restated Term Sheet . . . represent the entire understanding
> and agreement among the parties hereto with respect to the subject
> matter hereof and supercedes all prior and contemporaneous
> <u>agreements and understandings among the parties hereto</u>, both
> written and oral, with respect to the subject matter hereof,
> including without limitation the Commitment Letter and Term
> Sheet dated April 25, 2011 by the Plan Sponsors and New HoldCo.

(Ex. 5 (Commitment Letter § 15 (emphasis added).) The Integration Clause cannot supersede

the Bidding Procedures Order for several reasons.

*First*, the Bidding Procedures Order is not an "agreement" or "understanding"

between the parties.[19] Rather, as discussed above, it is a binding court order. Therefore, the

Integration Clause, which by its own terms only applies to "agreements and understanding

among the parties," does not bar the application of the Bidding Procedures Order.[20]

---

[19]     Indeed, Marc Beilinson, Debtors' Chief Restructuring Offer and Rule 30(b)(6) witness, testified at his
deposition as follows:

> Q: Is the bidding procedure order an agreement between the parties?
>
> A: No, it's not.
>
> Q: Is it an understanding between the parties?
>
> A: No.

(Beilinson Dep. 115:4-9.)

[20]     At the deposition of Marc Beilinson, Debtors' Chief Restructuring Officer, when asked what it meant that
the Deposit provision of the Commitment Letter (Section 6) survives the termination of the Commitment Letter
pursuant to Section 16, he testified:

> To me it would mean that there was $20 million and there was an escrow
> agreement that I recall seeing between -- it wasn't just between Cerberus and
> Chatham and me [i.e., Debtors]. It was between Cerberus, Chatham, I [i.e.,
> Debtors] and an escrow agent. And whatever happened to that deposit in
> accordance with this document, <u>the escrow agreement, is what happens, you
> know and that would control that $20 million.</u>

(Beilinson Dep. 158:2-16 (emphasis added).) If, however, as Debtors contend, the scope of the Integration Clause is
so broad as to supersede the Bidding Procedures, the Integration Clause would also supersede the Escrow
Agreement between Cerberus/Chatham, Debtors and the Escrow Agent who holds the Deposit, which would lead to
the absurd result of there being no operative document that governs the terms and conditions of how the Escrow
Agent holds the Deposit. Moreover, Debtors cannot possibly provide a reasoned basis for concluding that the

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

*Second*, the Bidding Procedures Order cannot be superceded by operation of the

Integration Clause in the Commitment Letter because Cerberus/Chatham was not a party to the

negotiations for the Bidding Procedures Order. Under New York law, "[t]he 'prior agreements

or understandings' referred to in the merger clause are . . . only those agreements, promises or

understandings that were part of the negotiations directly leading to the written settlement

agreement." *Exhibitgroup/Giltspur, Inc. v. Spoon Exhibit Servs.*, 273 A.D.2d 874, 874 (4th

Dep't 2000). In *Exhibitgroup*, the court found that a non-solicitation obligation was not

precluded by an integration clause because that obligation was "set forth in a separate integrated

writing and . . . was not one of those merged prior agreements or understandings." *Id.* Similarly,

here, the Bidding Procedures Order, including the Liquidated Damages Clause, is a separate,

"independently provable" document and therefore "was not one of those merged prior

agreements or understandings" under the Commitment Letter.

*Third*, as established above, the Bidding Procedures Order – and the Liquidated

Damages Clause contained therein – is clearly and unambiguously incorporated by reference in

the Commitment Letter. Accordingly, the Integration Clause in the Commitment Letter cannot

bar the application of the Liquidated Damages Clause in the Bidding Procedures Order. The

case of *Creative Waste Management, Inc. v. Capital Environmental Services, Inc.*, 429 F. Supp.

2d 582 (S.D.N.Y. 2006) is instructive on this score. In *Creative Waste Management*, the contract

at issue specifically referenced "Code Proposal # C0309537." Counterclaim-defendant argued

that this proposal could not be incorporated into the contract because "the contract was formed

two months after the proposal and the integration clause of the contract precludes written

proposals prior to the execution of the contract from becoming part of the contract." *Id.* at 602.

---

Integration Clause supersedes the Bidding Procedures Order, which was not an "agreement" or "understanding"
between Debtors and Cerberus/Chatham, but the Integration Clause does not supersede the Escrow Agreement,
which plainly is an "agreement" between Debtors and Cerberus/Chatham.

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

The court rejected the integration clause argument because "the language of the contract is clear

and unambiguous" and the contract "specifically references that the project will be performed

'per Code Proposal # C0309537,' thereby incorporating the prior proposal specifically

identified." *Id.* at 602-03.

      *Fourth*, if the Commitment Letter supersedes the Bidding Procedures pursuant to

the Integration Clause, the portion of Section 11 of the Commitment Letter dealing with the

enforcement of the Bidding Procedures Order would be rendered superfluous.  Section 11

provides: "Each of the parties hereto hereby irrevocably and unconditionally submits, for itself

and its property, to the exclusive jurisdiction of the Innkeepers Bankruptcy Court, in any action

or proceeding arising out of or relating to . . . the construction and enforcement of the Bidding

Procedures Order . . . ."  If the parties had intended to supersede the Bidding Procedures Order

pursuant to the Integration Clause, there would have been no need for Debtors to submit to the

Court's jurisdiction for claims arising out of or relating to the construction and enforcement of

the Bidding Procedures Order.

    H.    **If Parol Evidence Is Admissible to Determine the Scope of the Integration
    Clause, Parol Evidence Would Show that the Parties Did Not Intend for the
    Integration Clause to Preclude the Application of the Bidding Procedures**

      As discussed above, because the Commitment Letter clearly and unambiguously

incorporates the Bidding Procedures Order by reference, parol evidence should be inadmissible

to interpret the Commitment Letter.  *See Highland Crusader Offshore Partners, L.P.*, 2008 WL

3925272, at *8 (when a contract is unambiguous, "[e]vidence outside the four corners of the

document as to what was really intended but unstated or misstated is generally inadmissible to

add to or vary the writing").  If, however, the Court decides that parol evidence is needed to

determine the meaning of the Commitment Letter, the negotiating history of the Commitment

Letter would show that the parties never intended for the Integration Clause to bar the

**REDACTED IN ACCORDANCE WITH AMENDED**
**STIPULATED PROTECTIVE ORDER [DE 34]**

application of the Bidding Procedures Order. Rather, the negotiation history shows that the Integration Clause of the Commitment Letter was added – at Midland's request, not the Debtors – for two reasons: (1) to supersede prior versions of Cerberus/Chatham's Commitment Letter, and (2) because the Five Mile/Lehman Commitment Letter had an Integration Clause.

The First Cerberus/Chatham Commitment Letter, submitted on April 25, 2011, did not contain an Integration Clause. (*See* Ex. 13.) Two days later, on April 27, 2011, while the parties were negotiating changes to the First Cerberus/Chatham Commitment Letter, Midland's counsel sent an email to Debtors' counsel asking the parties, "Why was the 'Entire Agreement' section [i.e., the Integration Clause] deleted? This paragraph should be added back with a deletion to any reference to the Lehman/Five Mile Commitment." (Ex. 15.) Midland's counsel makes no reference to the Bidding Procedures Order or to the fact that the Commitment Letter should supersede the Bidding Procedures Order. And certainly Midland could not have believed that the Integration Clause in the Five Mile/Lehman Commitment Letter served to preclude the applicability of the Bidding Procedures Order because the Bidding Procedures Order did not exist at the time the Five Mile/Lehman Commitment Letter was executed. Rather, Midland's request that the Integration Clause be added to the Commitment Letter appears to be nothing more than a mechanical request to have the Commitment Letters by Cerberus/Chatham and Five Mile/Lehman mirror each other in all respects except price. Moreover, because the parties were negotiating a second version of the Cerberus/Chatham Commitment Letter, it made sense to add an Integration Clause to supersede the first version of the Commitment Letter. Accordingly, the negotiation history of the Integration Clause plainly shows that the parties never intended for it to operate to supersede the applicability of the Bidding Procedures Order.

69

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

### III. EVEN IF THERE WERE NO MATERIAL ADVERSE EVENT AND EVEN IF THE LIQUIDATED DAMAGES CLAUSE DID NOT APPLY, SPECIFIC PERFORMANCE SHOULD BE DENIED BECAUSE DEBTORS HAVE AN ADEQUATE REMEDY AT LAW

Assuming there was no material adverse event justifying termination of the Commitment Letter and that the Liquidated Damages Clause under the Bidding Procedures does not apply, Debtors' prayer for specific performance should be denied because Debtors have an adequate remedy at law, namely, compensatory damages. Under New York law, to obtain specific performance of a contract, a plaintiff must establish: "(1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) defendant is able to perform its obligations; and (4) plaintiff has no adequate remedy at law." *Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 221 (S.D.N.Y. 2003). However, "where a party's contractual obligation is simply to pay a specified sum, a legal remedy – the award of money damages – is readily available." *Id.* at 222.

Moreover, specific performance "is a matter of sound judicial discretion, not an arbitrary or capricious one, depending upon the mere pleasure of the court, but one which is controlled by the established doctrines and settled principles of equity." *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, Nos. 08-CV-7069 (KMK), 08-CV-11108 (KMK), 2009 WL 1154094, at *10 (S.D.N.Y. Mar. 19, 2009) (internal quotation marks omitted). Thus, "before the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002). The party seeking specific performance "must show equitable factors in its favor" and "must also demonstrate that its risk of injury is one that after balancing the equities entitles it to

70

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

relief." *Rockland Exposition, Inc.*, 2009 WL 1154094, at *10 (alteration and internal quotation marks omitted).

Factors to consider in determining whether there is an adequate remedy at law include "the difficulty of proving damages with reasonable certainty and of procuring a suitable substitute performance with a damages award." *Rockland Exposition, Inc.*, 2009 WL 1154094, at *14 (internal quotation marks omitted) (denying specific performance because "monetary damages are ascertainable"). And specific performance cannot be ordered "where money damages would be adequate to protect the expectation interest of the injured party." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04 Civ. 10014(PKL), 2006 WL 1493132, at *8 (S.D.N.Y. May 31, 2006) (internal quotation marks omitted).

Here, specific performance should be denied because Debtors have an adequate remedy at law. Debtors' compensatory damages can be measured by the difference between the Cerberus/Chatham bid and the amount Debtors receive from selling the Fixed/Floating Debtors to another party. Debtors' expert, Dr. Zmijewski, admits that "the starting point for measuring [Debtors' compensatory damages] would consist of the difference between what Innkeepers would have received if the transaction had been consummated, versus what Innkeepers ultimately will receive from another buyer." (Zmijewski Report ¶ 46.) Similarly, Marc Beilinson, Debtors' Chief Restructuring Officer and Rule 30(b)(6) witness, testified: "I guess it's this simple: If we had a backup bidder that was still alive, I think [the backup bidder was] $25 million less than [Cerberus/Chatham's] last bid, so the damages would be something, you know, like that." (Beilinson Dep. 142:5-13.)

In a public filing to this Court, Debtors have alluded to their "efforts to mitigate and maximize value of the Fixed/Floating Debtors in any subsequent marketing process."

71

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

(Plaintiffs' Memorandum of Law in Support of Motion to Expedite Proceedings on the Merits at

5 [Docket No. 2053].)  And on September 17, 2011, the Wall Street Journal reported that after

this adversary proceeding began, Five Mile/Lehman submitted a new bid for the Fixed/Floating

Debtors "that is slightly higher than" Five Mile/Lehaman's opening bid at the Fixed/Floating

Auction.  Mike Spector & Eliot Brown, *Innkeepers is in Talks With New Set of Buyers*, Wall St.

J., Sept. 17, 2011; ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████.  Since then, on September 30, 2011, it was reported that a group

consisting of Five Mile, Lehman, Hersha Hospitality and Starwood Capital signed a letter of

intent to purchase the Fixed/Floating Debtors for approximately $1 billion.  Tibita Kaneene,

*Innkeepers Strikes USD 1bn Deal with Five Mile and Lehman Led Group to Sell 64 Hotels*,

Debtwire, Sept. 30, 2011.

Because Debtors admit that they have an adequate remedy at law, in the event that

the Court finds that a material adverse event did not occur and that the Liquidated Damages

Clause does not apply, Debtors' are not entitled to specific performance.

## IV.   CERBERUS/CHATHAM DID NOT VIOLATE THE CONFIRMATION ORDER OR UNDERLYING PLAN OF REORGANIZATION

Debtors' Fourth Cause of Action is for violation of the Confirmation Order and

Underlying Plan of Reorganization.  In their Amended Complaint, Debtors assert that the Court

should use its equitable powers under 11 U.S.C. § 1142(b) to compel Defendants to "comply

with their obligations under the Fixed/Floating Plan and the Binding Commitment Letter."  (*See*

Am. Compl. ¶¶ 14 [Adv. Proc. Doc. No. 45].)

The Debtors' Plan of Reorganization (the "Plan") provides: "On the Effective

Date of the Fixed/Floating Plan, and subject to the terms of the Fixed/Floating Successful Bid,

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

New HoldCo [i.e., Cerberus/Chatham] shall purchase, directly or indirectly, the Interests of the

Post-Effective Date Fixed/Floating Debtors in return for the Investment." (Plan of

Reorganization at 49 (emphasis added) [Doc. No. 1799].) Under the Plan, the "Fixed/Floating

Successful Bid" is defined as "the bid of New HoldCo [i.e., Cerberus/Chatham] on the terms set

forth in the Commitment Letter." (*Id.* at 9.) Thus, Cerberus/Chatham's rights and obligations

under the Plan are <u>exactly the same</u> as its rights and obligations under the Commitment Letter.

In other words, the Plan does not give Debtors any rights against Cerberus/Chatham that are <u>in</u>

<u>addition to</u> those set forth in the Commitment Letter.

Similarly, the Confirmation Order provides: "the Commitment Letter, and all

documents related thereto, reflecting the terms of the Fixed/Floating Successful Bid, shall be

binding in all respects upon . . . the Cerberus/Chatham Fixed/Floating Plan Sponsors, New

HoldCo, . . . the Fixed/Floating Debtors and their respective affiliates and subsidiaries."

(Confirmation Order ¶ 140 [Doc. No. 1804].) Thus, the Confirmation Order simply confirms

that the Commitment Letter "and all documents related thereto" (including the Bidding

Procedures) are binding on the parties, something Cerberus/Chatham does not dispute. Like the

Plan, the Confirmation Order does not give Debtors any rights against Cerberus/Chatham that are

in addition to those set forth in the Commitment Letter.

Accordingly, Debtors' claim that Cerberus/Chatham violated the Confirmation

Order and underlying Plan is based entirely on – and therefore duplicative of – Debtors' claim

that Cerberus/Chatham's breached the Commitment Letter. (*See* Am. Compl. ¶¶ 105-14 [Adv.

Proc. Doc. No. 45].) *See Vill. of Rosemont v. Jaffe*, 482 F.3d 926, 935 (7th Cir. 2007)

(Section 1142(b) "does not confer any substantive rights on a party apart from whatever the plan

REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]

provides") (citing *In re U.S. Brass Corp.*, 301 F.3d 296, 306 (5th Cir. 2002)).  As such, Debtors'

Fourth Cause of Action should be dismissed.

## V.    DEBTORS' EQUITABLE ESTOPPEL CLAIM SHOULD BE DISMISSED

Debtors' Fifth Cause of Action is for Equitable Estoppel.  Under this claim,

Debtors allege that Cerberus/Chatham "represented to the Fixed/Floating Debtors that they

would fund the transaction absent an event that had a material adverse effect on the

Fixed/Floating Debtors as a whole."  (Am. Compl. ¶ 116 [Adv. Proc. Doc. No. 45].)  As set forth

in greater detail below, that allegation is insufficient to state a claim for equitable estoppel.

Under New York law, the elements of equitable estoppel are:  "(1) conduct which

amounts to a false representation or concealment of material facts; (2) intention that such

conduct will be acted upon by the other party; and (3) knowledge of the real facts."  *Babitt v.*

*Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 93-94 (2d Cir. 2003).

Here, Debtors do not and cannot allege that Defendants have made any false

representations or concealed any material facts.  Defendants' representation that they would fund

the transaction absent an event that had a material adverse effect on the Fixed/Floating Debtors

as a whole is not a false representation, and Debtors do not even allege that it was false.

Moreover, Defendants' decision to invoke the MAE Clause and terminate the Commitment

Letter is entirely compatible with the terms of the Commitment Letter.  *See S. Fed. Sav. & Loan*

*Ass'n of Ga. v. 21-26 E. 105th St. Assocs.*, 145 B.R. 375, 381 (S.D.N.Y. 1991) ("[T]he conduct

relied upon to establish estoppel must not otherwise be compatible with the agreement as

written.").  Accordingly, Debtors' equitable estoppel claim should be dismissed.

**REDACTED IN ACCORDANCE WITH AMENDED
STIPULATED PROTECTIVE ORDER [DE 34]**

## VI.   CONCLUSION

For the foregoing reasons, Debtors' Complaint should be dismissed in its entirety

with prejudice and the $20 million Deposit should be returned to Cerberus/Chatham in

accordance with the terms of the Bidding Procedures Order.

.

Dated: New York, New York          SCHULTE ROTH & ZABEL LLP
      October 3, 2011

By:  /s/ Howard O. Godnick
    Alan R. Glickman
    Howard O. Godnick
    Adam C. Harris
    Michael E. Swartz

919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for Defendants Cerberus Series Four
Holdings, LLC, INK Acquisition LLC, and
INK Acquisition II LLC*

WACHTELL, LIPTON, ROSEN & KATZ

By:  /s/ David C. Bryan
    Scott K. Charles
    David C. Bryan
    William Savitt
    Andrew J.H. Cheung
    Joshua A. Naftalis

51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendant Chatham Lodging Trust*

75